| | | |
|---|---|---|
| Mary M. Zapata, Individually and as Administrator | § | |
| of the Estate of Jaime J. Zapata, Amador Zapata, Jr., | § | |
| and Victor Avila, Jr. | § | |
| | § | |
| v. | § | |
| | § | |
| The United States of America; Manuel Barba; | § | |
| Otilio Osorio; Ranferi Osorio; Kelvin Morrison; | § | Civil Action No.1:13-cv-00022 |
| Blandon Derrick Shaffer; Robert Riendfliesh; | § | |
| JJ's Pawn Shop, Inc.; Off-Duty Enterprises, Inc.; | § | |
| Unknown FFL Dealer; BAE Systems, Inc.; | § | |
| O'Gara-Hess & Eisenhardt Armoring Company, | § | |
| L.L.C.;Unknown Vehicle Manufacturer/Outfitter; | § | |
| Department of Justice; Department of Homeland | § | |
| Security; Kenneth Melson; William D. Newell; | § | |
| Hector Tarango; David Voth; Lanny Breuer; | § | |
| Luis Alvarez; Juan Gelista; Jere T. Miles; | § | |
| Anthony Salisbury; Raul O. Aguilar; | § | |
| and John and Jane Doe(s) | § | |

## PLAINTIFFS' FOURTH AMENDED COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

NOW COME Mary M. Zapata, Individually and as Administrator of the Estate of Jaime J. Zapata, Amador Zapata, Jr. and Victor Avila, Jr., Plaintiffs, and file this Fourth Amended Complaint complaining of Defendants: Manuel Barba; Otilio Osorio; Ranferi Osorio; Kelvin Morrison; Blandon Derrick Shaffer; Robert Riendfliesh; JJ's Pawn Shop, Inc.; Off-Duty Enterprises, Inc.; Unknown federally licensed firearms dealers; BAE Systems, Inc.; O'Gara-Hess & Eisenhardt Armoring Company, L.L.C.; Unknown Vehicle Manufacturer/Outfitters; The United States of America; Department of Justice; Department of Homeland Security; Kenneth Melson; William D. Newell; Hector Tarango; David Voth; Lanny Breuer; Luis Alvarez; Juan Gelista; Jere T. Miles; Anthony Salisbury; Raul O. Aguilar; and John and/or Jane Doe(s) directly

responsible for decisions made with regards to gunrunning operations and the John and/or Jane Doe(s) straw purchasers not yet identified and would respectfully show the Court as follows:

## I.  PARTIES

1.  Mary M. Zapata is a Plaintiff both in her individual capacity and as Administrator of the Estate of Jaime J. Zapata.  Mrs. Zapata permanently resides in Brownsville, Cameron County, Texas.

2.  Plaintiff Amador Zapata, Jr. is an individual who permanently resides in Brownsville, Cameron County, Texas.

3.  Plaintiff Victor Avila, Jr. is an individual who currently resides in the United States.

4.  Defendant Manuel Barba is an individual and federal prisoner who resides in Houston, Harris County, Texas.  This Defendant was served on March 1, 2013, and he filed an answer on March 27, 2013.

5.  Defendant Otilio Osorio is an individual and federal prisoner who resides in Seagoville, Dallas County, Texas.  This Defendant was served on March 4, 2013, and he has not filed an answer.

6.  Defendant Ranferi Osorio is an individual and federal prisoner who resides in Texarkana, Bowie County, Texas.  This Defendant was served on March 7, 2013, and he has not filed an answer.

7.  Defendant Kelvin Morrison is an individual and federal prisoner who resides in Beaumont, Jefferson County, Texas.  This Defendant was served on March 21, 2013, and he has not filed an answer.

8. Defendant Blandon Derrick Shaffer is an individual who resides in Baytown, Harris County, Texas. This Defendant was served on February 27, 2013, and he has not filed an answer.

9. Defendant Robert Riendfliesh is an individual who resides in Dayton, Liberty County, Texas. This Defendant was served on February 22, 2013, and he has not filed an answer.

10. Defendant JJ's Pawn Shop, Inc. is a Texas corporation that is located in Beaumont, Jefferson County, Texas. This Defendant was served on February 19, 2013 and filed an answer on March 12, 2013.

11. Defendant Off-Duty Enterprises, Inc. is a Delaware corporation authorized to conduct business in Texas, and doing business as Off-Duty Armory in Burleson, Johnson County, Texas. This Defendant was served on February 19, 2013 and filed a Motion to Dismiss on March 12, 2013.

12. Defendant Unknown FFL Dealer is a fictitiously named defendant whose identity is presently unknown to Plaintiffs. Plaintiffs will seek leave to amend this compliant when such Unknown FFL Dealer becomes known.

13. O'Gara-Hess & Eisenhardt Armoring Company, L.L.C. (hereinafter "O'Gara") purchased the armoring division of BAE Systems, Inc., which was originally named as a defendant and properly served in this lawsuit. Pursuant to an agreement between counsel for O'Gara, BAE Systems, Inc. and Plaintiffs, BAE Systems, Inc. has not filed an answer in this cause because counsel continues to work to reach an agreement regarding successor liability issues. O'Gara may be served with process by serving its registered agent, Taft Service Solutions Corp., at 425 Walnut Street, Suite 1800, Cincinnati, OH 45202.

14. Defendant Unknown Vehicle Manufacturer/Outfitter is a fictitiously named defendant whose identity is presently unknown to Plaintiffs. Plaintiffs will seek leave to amend this complaint when Unknown Vehicle Manufacturer/Outfitter becomes known.

15. Defendant United States of America was served with process on February 20, 2013 and filed a Motion to Dismiss on April 26, 2013.

16. Defendant Department of Justice is an agency of the United States of America. It was served with process on February 21, 2013 and filed an answer on March 28, 2013.

17. Defendant Department of Homeland Security is an agency of the United States of America. It was served with process on February 21, 2013 and filed an answer on March 28, 2013.

18. Defendant Kenneth Melson, former Deputy Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives was an officer of the United States of America on the date of incident. He was served with process on February 21, 2013 and filed a Motion to Dismiss on May 13, 2013.

19. Defendant William D. Newell, former Special Agent in Charge of Phoenix Field Division of the Bureau of Alcohol, Tobacco, Firearms, and Explosives was an employee of the United States of America on the date of incident. He was served with process on February 21, 2013 and filed a Motion to Dismiss on May 13, 2013.

20. Defendant Hector Tarango, ATF Agent, authored a Report of Investigation pertaining to the incidents giving rise to this lawsuit. He is, or was at the time of the Incident, a Special Agent in Dallas Field Division, Field Office Dallas III, and an employee of the United States of America. He was served with process on February 19, 2013 and filed a Motion to Dismiss on May 13, 2013.

21. Defendant David Voth, former supervisor of the ATF Phoenix Group VII who oversaw Operation Fast and Furious, was an officer of the United States of America on the date of incident. He was served with process on February 21, 2013 and filed a Motion to Dismiss on May 13, 2013.

22. Defendant Lanny Breuer, former Assistant Attorney General, was an officer of the United States of America on the date of incident. He was served with process on May 15, 2013 and filed a Motion to Dismiss on May 13, 2013.

23. Defendant Luis Alvarez formerly served as Assistant Director for the U.S. Immigration and Customs Enforcement Homeland Security Investigations Office of International Affairs. He was served with process on February 19, 2013 and filed a Motion to Dismiss on May 13, 2013.

24. Defendant Juan Gelista, OIA U.S. Immigrations and Customs Enforcement Supervisor, was an employee of the United States of American on the date if incident. He was served with process on February 21, 2013 and filed a Motion to Dismiss on May 13, 2013.

25. Defendant Jere T. Miles, was an employee of the United States on the date of incident. He was served with process on February 21, 2013 and filed a Motion to Dismiss on May 13, 2013.

26. Defendant Anthony Salisbury was an employee of the United States on the date of incident. He was served with process on February 19, 2013 and filed a Motion to Dismiss on May 13, 2013.

27. Defendant Raul O. Aguilar, U.S. Immigrations and Customs Enforcement Supervisor, was an employee of the United States of America on the date of incident. He was served with process on February 6, 2013 and filed a Motion to Dismiss on May 13, 2013.

28.	Defendants John and/or Jane Doe(s) are fictitiously named defendants whose identities are presently unknown to Plaintiffs.  Plaintiffs will seek leave to amend this complaint when John and/or Jane Doe(s)'s true name(s) become known.

## II.	JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

29.	This Court has jurisdiction over Plaintiffs' *Bivens* and FTCA claims pursuant to U.S.C. Const. art. III, § 2, cl. 1, 28 U.S.C. § 1331, and 28 U.S.C. § 1346(b)(1).  The Court has jurisdiction over Plaintiffs' FOIA action under 5 U.S.C. § 552(a)(4)(B).  The Court has jurisdiction over Plaintiffs' remaining claims under 28 U.S.C. § 1367.

30.	Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3) and (e)(1).

31.	Pursuant to 28 U.S.C. § 2675(a) the claim set forth herein was presented to the Federal Bureau of Investigation ("FBI"), the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), and the U.S. Immigration and Customs Enforcement ("ICE") on or about June 14, 2012.

32.	ICE was designated as the lead agency to adjudicate the claims and was authorized by the FBI and ATF to adjudicate the tort claims made against those agencies as well. On or about January 7, 2013, ICE denied all tort claims made by Plaintiffs against ICE, FBI, and ATF.

33.	All conditions precedent to a Federal Tort Claims Act have been met.

### III. FACTUAL BACKGROUND

#### A. *The Federal Government Knowingly Allowed Guns to Walk into Cartels' Hands*

34. For years, dangerous drug cartels in Mexico have been acquiring firearms such as AK-47 variants, M-16 variants, and 50-caliber sniper rifles through whatever sources are available, including through gun dealers in the United States. Cartels use these firearms in cartel wars, against Mexican and U.S. officials and agents, and in the killing of innocent civilians, both Mexicans and Americans.

35. One common avenue for the cartels to acquire weapons from the United States is to use a straw purchaser—i.e., a person who can purchase the firearm from the gun dealer, who will then transfer the firearm(s) to persons that will smuggle the firearms into Mexico.

36. With knowledge that the Mexican drug cartels often use straw purchasers in the United States, the ATF, specifically the Phoenix field office of the ATF, implemented a program called "Fast and Furious." As part of Fast and Furious, the Phoenix office identified 43 persons in the Phoenix area that it suspected of being straw purchasers linked to the smuggling of firearms into Mexico and into the hands of the Mexican drug cartels. The ATF agents in the Phoenix office visited most of the local gun dealers and instructed the gun dealers to continue selling to the people who were on this list of suspected straw purchasers and to notify ATF of any transactions with these individuals.

37. The Phoenix field office conducted surveillance on some of these gun dealers and on some of the individuals suspected of being straw purchasers. The ATF observed numerous straw purchases of firearms taking place as well as the transaction following the purchase that resulted in the transfer of the firearms to persons suspected of transferring the firearms into

Mexico. However, the ATF agents were instructed not to make any arrests and not to follow the firearms after the firearms were transferred. Instead, the ATF agents purposely allowed these illegal firearms transactions to take place and then allowed the firearms to disappear from their surveillance. In other words, they allowed the guns to "walk."[1] Indeed, the policy was to *not* maintain surveillance on the firearms that the ATF suspected would be transported to Mexico. Moreover, the ATF agents were instructed not to stop the transfer and transportation of the large majority of these firearms, which the ATF agents had numerous opportunities and legal grounds to interdict. Moreover, until a border patrol agent, Brian Terry, was murdered with one of these Fast and Furious weapons, the ATF agents were not given authority to make any arrests in connection with Fast and Furious. In short, the ATF was allowing guns to walk that the agents knew were destined for Mexico and the hands of cartel members.

38. Another key part of the Fast and Furious program involved preventing anyone from tracing these firearms that were allowed to walk when they turned up at crime scenes. Once a gun dealer notified the ATF of a sale to a suspected straw purchaser, an ATF agent in the Phoenix office would input the information about that gun into the suspect gun-database. This was a database that only the ATF can access, and because of the security settings on Fast and Furious, only agents assigned to Fast and Furious could access information entered about these firearms. The effect of entering firearms into this database is that when a firearm is recovered and someone attempts to trace it using eTrace, the ATF case agent and his supervisor who oversaw the firearm being entered into the database are notified of the attempted trace and must authorize the trace to continue. The policy in Fast and Furious was not to permit any traces to proceed. The effect of this was that the person who recovered the firearm at a crime scene or

---

[1] "Walking," according to Defendant Newell, is a common law enforcement term used to describe a situation in which "a law enforcement agency . . . actually puts some sort of evidence into the hands of a suspect in an undercover operation or an investigation and . . . then don't [sic] follow up where that is going."

otherwise would not obtain any trace information.  Moreover, the gun dealer who sold the gun would not be notified of the eTrace on the firearm he sold, i.e., it would not know if/when a firearm sold was used in crime or was found in Mexico.

39.     On information and belief, the Fast and Furious program, aka the Phoenix-model, was to be the method by which ATF field offices in the border states would all operate.   Indeed, agents from other field offices, including Dallas and Houston, were flown to Phoenix in 2010 for training on this program.  A number of agents who were there for training expressed concerns that this seemed to be no more than a gunwalking operation.  However, any agent with too many questions was reassigned.

40.     On information and belief, the Phoenix-model of Fast and Furious also spread naturally to other offices as Fast and Furious weapons and purchasers turned up in other areas. Cases based on the Phoenix model were opened in the Las Cruces, New Mexico field office as well as the El Paso and Dallas divisions.  Specifically, the Las Cruces case 785096-10-0035 and the Dallas case 782080-11-0011 were parallel to the Phoenix model, i.e., the Fast and Furious program.   As in Phoenix, a critical part of these cases was a policy of not maintaining surveillance of the firearms, not making arrests, and not interdicting the weapons before they crossed into Mexico—i.e., simply allowing the guns to walk.

**B.     *The Gun Dealers Knowingly Sold Firearms to Straw Purchasers***

41.     An integral part of Fast and Furious (and parallel cases in other divisions) was the willingness of gun dealers, specifically Federal Firearm Licensed dealers (hereinafter "FFLs"), to knowingly sell firearms to straw purchasers.

42.     On or about May 26, 2010, Defendant JJ's Pawn illegally sold ten (10) AK-47 variant WASR-10 rifles to Defendant Blandon Derrick Shaffer, a notorious straw buyer under

ATF investigation. Subsequently, on or about August 20, 2010, Defendant JJ's Pawn illegally sold ten (10) AK-47 variant WASR-10 rifles to straw purchaser Defendant Robert Riendfliesh. JJ's Pawn noted that Riendfliesh had acquired additional firearms from their business. JJ's Pawn knew or should have known that Shaffer and Riendfliesh were straw purchasers.

43. Moreover, JJ's Pawn knew or should have known that Schaffer and Riendfliesh would use the firearms illegally, that these purchasers were trafficking the firearms, that the firearms were destined to be smuggled to Mexico, and/or that these straw purchasers would otherwise be using the firearms in a manner involving an unreasonable risk of physical harm to others.

44. Indeed, these straw buyers purchased these firearms to illegally traffic them to drug cartels in Mexico. Defendant Manuel Barba, a person prohibited from possessing firearms, directed Riendfliesh and Shaffer to buy a number of firearms from a particular FFL, JJ's Pawn. Barba illegally exported these firearms supplied by Defendant JJ's Pawn to cartels in Mexico.

45. Similarly, Defendant Off-Duty Armory, sold firearms to known straw purchasers. Specifically, on or about October 10, 2010, Off-Duty Armory illegally sold an AK-47 variant Draco handgun to a straw purchaser and weapons trafficker, Defendant Otilio Osorio, at a gun show in Fort Worth, Texas. At the time of the sale, Off-Duty Armory knew or should have known that Osorio would use the firearms illegally, that Osorio was trafficking the firearms, that the firearms were destined to be smuggled to Mexico, and/or that Osorio would otherwise use the firearms in a manner involving an unreasonable risk of physical harm to others.

46. Indeed, Osorio purchased the firearm from Off-Duty Armory as a straw purchaser. Otilio Osorio, Ranferi Osorio, and Kelvin Morrison worked together to obtain and illegally export firearms, including the Draco supplied by Off-Duty Armory, to cartels in

Mexico. The Osorio brothers and Morrison had been under investigation and suspected of this illegal activity dating back to the summer of 2010.

### C. The Mexico Supervisors Sent Zapata and Avila to their Death

47. Just a few months after these firearms were purchased from JJ's Pawn and Off-Duty Armory, under the ATF's Phoenix-model in which the firearms were allowed to walk into Mexico, the firearms had reached their destination—the hands of dangerous cartel members in Mexico.

48. In February 2011, Victor Avila was working in the ICE office in Mexico City. He had been there with his family for a couple of months by this time. Jaime Zapata had just arrived in the Mexico City office of ICE on a temporary duty assignment.

49. On February 14, 2011, Defendants Alvarez, Miles, Salisbury, Gelista, and Aguilar (hereinafter "Mexico Supervisors") instructed Avila and Zapata to travel down Mexico Highway 57 towards San Luis Potosí to pick up some equipment. Prior to this, Avila and Zapata were not acquainted, and the equipment was for a case in which neither of these agents was involved.

50. Less than a month before these orders were given to Zapata and Avila, a security notice had been sent to all embassy employees stating that travel, whether personal or work-related, was restricted on certain highways, including this stretch of Highway 57. Indeed, the notice indicated that travel in these areas was a direct violation of certain policy.

51. In addition, an email on February 11, 2011, the same date that Zapata and Avila were ordered to travel on this road, notified Department of Homeland Security that there had recently been a number of skirmishes between cartels and federal forces on this stretch of highway. The email further indicated that a diplomatic pouch could be used to transport the equipment, rather than having ICE agents travel on this highway to pick it up.

52. Despite knowing that travel on this highway was restricted, the Mexico Supervisors did not even follow the normal established safety policies and procedures for travel on highways in Mexico. The established travel policy required preparation of a travel plan many days in advance and notification to Mexican officials so that such officials could arrange an escort for the travel. The established policy also provided that ICE agents would not travel alone, in one vehicle, but there would be at least two vehicles traveling together and the Mexican government would be present. None of these policies were followed. Instead, Zapata and Avila were hastily sent out in a single vehicle without any preparation or plan for an escort, and based on information and belief, the Mexican authorities were not notified of the travel plans.

53. In light of the security notice, the dangers involved, the lack of planning, and the failure to arrange for an escort, Avila had numerous concerns about this trip. Avila raised these concerns to his supervisors. Despite Avila's objections, the Mexico Supervisors directed Avila and Zapata to travel on the dangerous highway unescorted to pick up equipment for a case in which neither agent was involved.

54. The trip was actually even more dangerous than Avila or Zapata realized because they were sent out in an up-armored Chevrolet Suburban that was insufficient to protect them. The GPS and PA system were inoperable, and the vehicle was improperly maintained. Further, when the vehicle was placed in park, the vehicle doors automatically unlocked and the weight of the doors allowed them to open. BAE Sustainability Systems, which was later acquired by Defendant O'Gara, rebuilt, outfitted, and installed armoring on the vehicle but failed to disable the automatic unlock feature.

55. On February 15, 2011, Zapata and Avila were driving back from picking up the equipment on Highway 57 near Santa Maria Del Rio in the northern state of San Luis Potosi,

when Mexican drug cartel members intercepted them. Zapata, who was driving the vehicle, placed the vehicle in park, which caused the doors to unlock and swing open due to the weight of the armor in the doors. This provided an opportunity for the cartel members to breach the armored capabilities of the vehicle and open fire on the two agents trapped inside, killing Zapata and severely wounding Avila.

56. At least three of the firearms used in the attack were recovered and given to the U.S. government. These firearms originated in the United States. Indeed, the guns were purchased by known straw purchasers as part of cases parallel to the Phoenix model of the Fast and Furious program, in which the ATF knowingly allowed guns to walk into Mexico. Specifically, one of these firearms was the AK-47 variant WASR-10 rifle bearing serial no. 1981MF8477 and purchased by Defendant Riendfliesh as described above. Another firearm used in this attack on Zapata and Avila was the AK-47 variant Draco handgun bearing serial no. DC-2777-10 purchased by Otilio Osorio as described above.

**D.** **Since this Attack, the Government has Intentionally Covered Up Facts and Withheld Information from Avila and Zapata's Family**

57. The ATF acted immediately following this shooting to try to cover up the fact that it allowed these firearms that were used in the attack to walk into Mexico and into the cartel's hands. William D. Newell reviewed the files in the cases involved shortly after the attack.

58. A new ATF case was opened in November 2010. The only report of investigation in this case file described a "controlled delivery" of certain firearms; however, this document was not generated until February 25, 2011, *after* the attack on Zapata and Avila. There is no explanation provided for the report not being created until over three months after the purported controlled delivery in November. The case file also contains information on Otilio Osorio,

Ranferi Osorio, Talamentes, and Morrison, but similarly, this information was not uploaded to the file until *after* the attack on Zapata and Avila. The only explanation for these after-the-fact additions to the case is that the ATF was trying to cover up the fact that it knew these guns were walking and ending up in Mexico and it did nothing to stop it.

59. On or about July 26, 2011, Congress issued a Joint Staff Report regarding DOJ's Operation Fast and Furious. Congress addressed ATF's and DOJ's failure to share crucial details of Operation Fast and Furious with either their own employees stationed in Mexico or representatives of the Mexican government. The high-risk tactics of cessation of surveillance, gunwalking, and non-interdiction of weapons that ATF used in Operation Fast and Furious went against the core of ATF's mission, as well as the training and field experience of its agents. These inherent flaws of Fast and Furious made its tragic consequences inevitable.

60. The United States, ICE, ATF, and other agencies have ignored the Zapata family's requests for information on their son's death. They have also retaliated against Avila as an ICE agent because of his questions about events surrounding the attack.

61. It is unknown how many deaths and injuries have resulted from firearms purchased under Fast and Furious and similar cases in other field offices, and the ATF and federal government have actively worked to prevent as few connections being made as possible. However, despite the ATF and federal government's efforts to hide the source of the weapons used to attack Zapata and Avila, Plaintiffs can show that the firearms used in this attack were purchased under ATF cases similar to Fast and Furious.

**IV. CLAIMS UNDER FEDERAL TORT CLAIMS ACT AGAINST DEFENDANT UNITED STATES**

62.     Plaintiffs re-allege and incorporate by reference the preceeding paragraphs for all purposes as if set forth fully herein.

63.     The following claims are brought by Plaintiffs against Defendant, the United States of America, for action undertaken by its employees and agents, including employees of ATF, ICE, and other agencies, all acting within the scope of their employment.

### A. Negligence

64.     Defendant, the United States, owed a legal duty to Plaintiffs, both in its capacity as an employer to Zapata and Avila and as a result of their acts and omissions that armed the Mexican cartel members who attacked Zapata and Avila.

65.     The United States' legal duties to Zapata and Avila include, but are not limited to: 1) the use of ordinary care in providing a reasonably safe workplace (which it breached through, inter alia, improper supervision, improper inspection, maintenance, and use of an unsafe vehicle, and gunwalking knowledge); 2) use of ordinary care in establishing rules and regulations for an employee's safety; 3) use of ordinary care in warning employees of the hazards of employment that are not commonly known or appreciated by employees; 4) use of ordinary care in furnishing reasonably safe machinery/vehicles; 5) use of ordinary care in supervising an employee's activities; 6) use of reasonable care to prevent an employee from actuating an unreasonable risk of harm to others; and 7) use of ordinary care in directing the manner of an employee's work.

66.     In addition, the United States' legal duties to Plaintiffs also include, but are not limited to: 1) use of reasonable care to prevent an employee from creating an unreasonable risk of harm to others; 2) duty to prevent injury to others if it reasonably appears or should appear

that in the exercise of their lawful rights, others may be injured by a dangerous condition that was created by the United States; 3) exercise reasonable care to avoid a foreseeable risk of injury to others; 4) duty to take affirmative action to control or avoid creating or increasing the danger from a condition; 5) use of ordinary care in aiding or protecting others from peril at least partially created by Defendant; 6) use of ordinary care in not placing others in the way of foreseeable criminal activity; and 7) use of ordinary care not to create a dangerous situation that reasonably appears or should appear to it that others in the exercise of their lawful rights may be injured thereby.

67. The United States breached its duties to Zapata and Avila by failing to arrange for safe travel, violating policies that were in place to provide protection for Zapata and Avila, failing to exercise proper oversight, providing a defective vehicle, and other acts and omissions that put Zapata and Avila in harm's way and at a greater risk of injury.

68. Moreover, the United States breached its duties to Plaintiffs by failing to abide by policies regarding arms export regulations (including violations of the Gun Control Act and internal ATF policies), surveillance of firearms suspected to be involved in trafficking to Mexico, gun walking, failing to disclose dangers inherent in its gunwalking operations, and similar acts and omissions that enabled the Mexican cartel members to acquire the firearms used in the attack.

69. The United States' breach of these duties proximately caused injury to Plaintiffs, resulting in the damages specified below.

### B. Negligent Undertaking

70. The United States, specifically through the ATF and its agents, has undertaken to perform services to protect "communities from violent criminals, criminal organizations, [and]

the illegal use and trafficking of firearms…" ATF Mission Statement. The ATF field offices involved in Operation Fast and Furious and similar cases based on this Phoenix model, further undertook to facilitate the transfer of firearms to straw purchasers who trafficked them to cartels in Mexico.

71.    The United States, specifically the ATF and its agents, recognized or should have recognized the undertaking  as necessary for the protection of the public's safety, including the safety of its agents working in Mexico. The ATF is the primary agency that is involved in monitoring firearms trafficking and undoubtedly those agents in field offices in border states recognized the importance of their role in *stopping* gun trafficking to Mexico (as opposed to enabling it).

72.    The United States, specifically the ATF and its agents, failed to exercise reasonable care to perform this undertaking. The ATF's decision, in violation of stated policy, not to maintain any surveillance on the firearms that it knew were transferred to straw purchasers who were likely trafficking firearms to Mexico constituted a failure to exercise reasonable care. The ATF and its agents' acts and omissions in allowing many of these firearms to enter Mexico, without notifying any United States agency operating in Mexico or the Mexican government constituted a failure to exercise reasonable care. The ATF and its agents further failed to exercise reasonable care by their active role in preventing traces via eTrace of firearms purchased through Fast and Furious and similar programs from being completed, thus preventing both FFLs and the agency recovering the firearms from receiving information on the trace. The ATF and its agents' failure to exercise reasonable care in this undertaking is further demonstrated through other acts and omissions that enabled firearms to enter the Mexican cartel members' hands over the course of numerous years.

73. The United States', the ATF's, and its agents' failure to exercise such care increased the risk of the harm befalling Zapata and Avila. Indeed, the attack on Zapata and Avila was made possible by these failures, resulting in the damages specified below.

C. *The United States, through Gunwalking Operations, Created the Danger that Resulted in Plaintiffs' Injuries*

74. Through Fast and Furious, and similar cases based on the Phoenix model, that allowed guns to walk, the United States increased the danger to Zapata and Avila. The fact that the very guns used to attack Zapata and Avila were firearms that the ATF and its agents deliberately failed to maintain surveillance on with knowledge that they were destined for Mexico demonstrates that the collective acts and omissions of the United States, the ATF, and its agents created or increased the danger to Zapata and Avila.

75. The United States, specifically the ATF and its agents, acted with deliberate indifference. They knew that failing to maintain surveillance on firearms destined for Mexico and the hands of cartel members necessarily created a dangerous situation. Furthermore, they used their authority to create an opportunity that would not have otherwise existed. Indeed, the ATF and its agents, through Fast and Furious and parallel cases, orchestrated the transfer of firearms from FFLs, to straw purchasers, and into the channels to be smuggled into Mexico, yet deliberately failed to maintain surveillance on these firearms, make any efforts to prevent the firearms from entering Mexico, or interdict the firearms before they reached the cartels. Moreover, certain acts, such as preventing eTraces on Fast and Furious weapons recovered from crime scenes, enabled the ATF to continue this gunwalking operation undetected for years. On information and belief, ATF and certain agents also instructed other agencies not to interdict certain firearms and not to make arrests. The ATF and its agents used their position and

authority to put these firearms in the hands of cartel members, creating an unnecessary danger to agents working in Mexico such as Zapata and Avila.

76. Because of the state-created danger, Zapata and Avila suffered injuries resulting in damages specified below.

***D.    The United States, through its Agents Acting in Mexico, Created the Danger that Resulted in Plaintiff's Injuries***

77. Zapata and Avila's supervisors who insisted that they travel on the known dangerous highway, unescorted, in violation of the security warning and ICE policy, also increased the danger to Zapata and Avila.

78. The United States agents who ordered Zapata and Avila to venture out on the highway alone used their authority to create an opportunity that would not have otherwise existed.  If they had used a diplomatic pouch to transfer the equipment, as was suggested, Zapata and Avila would not have been attacked that day.  If the agents had arranged for an escort by the Mexican government, as was required by standard safety policy and procedure, the opportunity to that the drug cartel had to attack Zapata and Avila would not have existed.   Moreover, if the agents had equipped Zapata and Avila with proper safety equipment and a vehicle that was well maintained, with the requisite communication systems, and without the defect that allowed the doors to open, the drug cartels would not likely have been successful in their attack on Zapata and Avila.

79. Because of the danger created by the United States' agents who put Zapata and Avila in the vehicle, unescorted on that dangerous highway, Zapata and Avila suffered injuries resulting in damages specified below.

### E. Negligence Per Se

80. The United States' negligence described above also violated federal statutes and regulations including, but not limited to, provisions of the Gun Control Act, 18 U.S.C. § 922, *et seq.*, 18 U.S.C. § 924, *et seq.*, and FFL regulations prohibiting the straw sale of firearms. Furthermore, the United States' acts and omissions violated the Arms Export Control Act, 22 U.S.C. § 2778. The United States is a "person" under the statute and engaged in activities described in 22 U.S.C. § 2778 that are contrary to the law. Furthermore, pursuant to 18 U.S.C. § 2, the United States would be considered the principal in the actions of aiding, abetting, counseling, commanding, inducing, and/or procuring the sale of firearms as described above. Moreover, the United States failed to abide by the provisions of 21 U.S.C. §§ 1901-08 and, thus, aided, abetted, and/or materially assisted in the violation of the Act. The provisions described in this paragraph are penal in nature and impose a legal duty on the United States.

81. Plaintiffs fall into the class of persons these statutes were designed to prevent. These statutes, other firearm laws and regulations, and other public safety laws and regulations are designed to protect the safety of the general public and law enforcement officers from the substantial risk of serious physical harm posed by illegal firearms transactions and firearms trafficking.

82. The United States' violation of and conspiracy to violate these statutes and federal firearm laws and regulations constitute negligence per se. The United States, having knowledge of the dangers posed by the violation of the statutes, proceeded with the violation of public safety statutes and federal laws and regulations in conscious disregard for the lives and safety of those who the statute was designed to protect, including Agents Zapata and Avila.

83. As a direct and proximate result of the United States' negligence per se, Plaintiffs suffered damages as described below.

**F. Public Nuisance**

84. The United States created and/or maintained a public nuisance. Specifically, this public nuisance was created and/or maintained by allowing firearms to walk without maintaining surveillance where the United States knew or had reason to believe these firearms were destined for illegal activity and/or to the hands of cartels in Mexico. The United States, the ATF, and its agents failed to perform certain legal duties by allowing, indeed enabling, Mexican cartels to obtain these firearms.

85. These acts and omissions intentionally caused firearms to reach cartels in Mexico and/or permitted firearms to reach the hands of cartel members. The long-term, cumulative effect of these acts and omissions has created an environment whereby cartels have firearms readily available, a fact that the United States knows or has reason to know has a significant effect on the public's rights. These acts and omissions that have effectively armed cartels in Mexico have injured and/or endangered the public health, safety, peace, and welfare. Providing firearms to dangerous cartels in Mexico constitutes an unreasonable interference with a right to personal safety and security common to the general public.

86. The existence of this public nuisance proximately caused injury to Zapata and Avila and the damages Plaintiffs suffered as specified below. Accordingly, Plaintiffs suffered a special injury because of this nuisance and are entitled to recover damages.

**G. Intentional Infliction of Emotional Distress**

87. The United States, including the ATF and its agents, intentionally or recklessly placed weapons in the hands of criminals and Mexican drug cartel members and then failed to

warn anyone that they had done this, thereby placing Agents Zapata and Avila in harm's way. The United States's conduct created, contributed to, and/or increased the risk of harm to anyone in Mexico, specifically agents operating in Mexico such as Zapata and Avila. The conduct was extreme and outrageous, going beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. These actions ultimately caused Plaintiffs severe emotional distress, with which they continue to struggle.

88.     Moreover, the United States has conducted an ongoing cover-up to deprive Avila and the Zapata family of the answers they rightfully deserve, in relation to this attack. The United States has engaged in a deliberate cover-up concerning how the weapons involved in the attack came into the hands of these cartel members. The United States refuses to answer any questions about the reasons behind Zapata and Avila being sent on this highway, unescorted, in an unsafe vehicle. On information and belief, the United States has deliberately denied information to or presented inaccurate information to Plaintiffs concerning the events leading up to and surrounding the attack.

89.     In addition, the United States, specifically ICE and certain ICE agents, have retaliated against Avila when he began asking "too many" questions about the circumstances of the attack and the weapons used. This retaliation resulted in, among other things, stripping him of his weapon, computer access, and vehicle, and forcing him to relocate, resign, or retire from his position in Spain without cause. The act of retaliation against Avila have continued to date.

90.     The United States has and continues to cause damages with its blatant refusal to answer Avila's and the Zapata family's concerns and questions regarding the attack, the firearms allowed to enter into Mexico, and the United States' involvement.

91. The last act of this strain of outrageous and tortious conduct – the cover-up set forth in more detail in the above factual allegation section – continues to cause damages to Avila and the Zapata family.

92. This cover up and the concomitant deception has been committed intentionally and knowingly (or at least recklessly). The cover-up, deception, and retaliation in response to the Avila and the Zapata family asking basic questions about the circumstances surrounding the attack constitute extreme and outrageous conduct.

93. Defendant's conduct continues to proximately cause severe emotional distress to Avila and the Zapata family. Plaintiffs are and will continue to suffer severe emotional distress, mental anguish, loss of society, and strain directly relating to their inability to understand the circumstances surrounding the death of Jaime Zapata and the injuries to Victor Avila. Extreme emotional distress has also resulted from the United States' intentional refusal to answer questions and retaliation against Avila for asking them.

## V. *BIVENS* CLAIMS AGAINST GUNRUNNER DEFENDANTS

94. Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all purposes as if fully set forth herein.

95. Plaintiffs seek to recover from Kenneth Melson, William D. Newell, Hector Tarango, David Voth, Lanny Breuer, and the John and/or Jane Does involved in the gunwalking activities set forth herein (hereinafter "Gunrunner Defendants") for violations of their Constitutional rights.

### A. Bivens Claims

96.     Plaintiffs Victor Avila, Jr. and Mary M. Zapata, as Administrator of the estate of Jaime Zapata are entitled to recover for violations of the Due Process Clause of the Fifth Amendment, which protects citizens' liberty interest in their own bodily security from violation by federal government action.  Similarly, Mary and Amador Zapata, the natural parents of Jaime Zapata are entitled to recover for the deprivation of their constitutional right to a continuing relationship with their son under the Due Process Clause of the Fifth Amendment and Free Association Clause of the First Amendment to the Constitution of the United States.

97.     This cause of action is brought by Plaintiffs against the Gunrunner Defendants for deprivation of constitutional rights within the meaning of *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) ("*Bivens*").

98.     The Gunrunner Defendants created a dangerous environment in Mexico.  Through Fast and Furious, and similar cases based on the Phoenix model in other field offices, that enabled guns to walk into the hands of Mexican cartel members, the Gunrunner Defendants increased the danger to Zapata and Avila.

99.     The Gunrunner Defendants acted with deliberate indifference.  They knew that failing to maintain surveillance on firearms destined for Mexico and the hands of cartel members necessarily created a dangerous situation.  Furthermore, they used their authority to create an opportunity that would not have otherwise existed.  Indeed, the Gunrunner Defendants, through Fast and Furious and parallel cases, orchestrated the transfer of firearms from FFLs to straw purchasers and into the channels to be smuggled into Mexico.  These Defendants deliberately failed to maintain surveillance on these firearms, make any efforts to prevent the firearms from entering Mexico, or interdict the firearms before they reached the cartels.  Moreover, certain acts,

such as preventing eTraces on Fast and Furious weapons recovered from crime scenes, enabled the ATF to continue this gunwalking operation undetected for years. On information and belief, the Gunrunner Defendants also instructed other agencies not to interdict certain firearms and not to make arrests. The Gunrunner Defendants used their position and authority to put these firearms in the hands of cartel members, creating an unnecessary danger to agents working in Mexico such as Zapata and Avila.

100. Specifically, Defendant Melson, who was acting director of the ATF in 2010, had first-hand knowledge of what was involved in Fast and Furious, and was aware that the firearms were being allowed to walk without surveillance on the firearms after the straw purchaser transferred them, and he authorized this practice. As early as June 2010, Defendant Melson had visited the Phoenix field office and discussed the FFLs involved in the operation as well as the alleged target straw purchasers. On information and belief, Defendant Melson reviewed the Organized Crime Drug Enforcement Task Force ("OCEDETF") proposal from the Phoenix field division that spelled out the fact that Fast and Furious was simply a gun walking operation as no surveillance was maintained on the firearms that were destined for the hands of criminals. In light of this knowledge and as director of the ATF at the relevant time, Defendant is liable for his participation in permitting these firearms, some of which were ultimately used to shoot Zapata and Avila, to enter the hands of the cartels in Mexico.

101. Defendant Newell, as the Special Agent in Charge, bears responsibility for the failures in Fast and Furious. He failed to consider any measures to minimize the risk to the public created by the Fast and Furious "targets" and failed to reassess the strategy despite the compelling evidence the investigation accumulated. He knew in January 2010 that the agents under his command were not confronting subjects, seizing firearms, or making arrests. Based on

information and belief, the agents were not doing any of these things because Defendant Newell had ordered them not to. Defendant Newell reviewed the cases involving the firearms involved in the attack on Zapata and Avila just days after the attack occurred. On information and belief, he was intimately involved in the cover-up efforts to prevent discovery of the link between these weapons and Fast and Furious (or parallel cases in other ATF offices). It is believed that additional discovery will reveal additional information about Defendant Newell's involvement and his acts and omissions that contributed to creating the danger that resulted in the attack on Zapata and Avila and in Plaintiffs' damages.

102. Defendant Voth was responsible for providing the first-level management and oversight on Fast and Furious. Defendant Voth instructed the ATF agents under his command not to execute any overt action against the straw purchasers or make any seizures or arrests. Defendant Voth visited D.C. on at least two occasions to discuss Fast and Furious with his superiors/headquarters, and on one occasion, he presented an extensive power point presentation that would have put anyone in the audience on notice that this was nothing more than a gunwalking operation. Defendant Voth also wrote the weekly reports for Group 7, the group focused on Fast and Furious. These reports, which at least should have been reviewed by Gillette and Newell, were sent to headquarters for their review. These reports detail the purchases by certain "targets" each week, and collectively shed light on the fact that guns were transferred but no arrests were made and no surveillance was being maintained on the firearms after they were transferred by the straw purchasers. On information and belief, Defendant Voth and George Gillett worked closely to ensure that surveillance was not maintained on the firearms and that no arrests were made—i.e., they implemented directives that enabled the guns to walk. Defendant Voth's actions were intended to permit guns to enter the hands of Mexican drug

cartels. It is believed that additional discovery will reveal additional information about Defendant Voth's involvement and his acts and omissions that contributed to creating the danger that resulted in the attack on Zapata and Avila and in Plaintiffs' damages.

103. Although in February 2011, Defendant Breuer denied that the ATF was involved in gunwalking in early 2010, Defendant Breuer was aware of the details of Fast and Furious and the fact that the program deliberately allowed guns to walk. Indeed, on information and belief, Defendant Breuer personally reviewed the affidavits supporting the application for the wire, which should have raised numerous concerns that this was merely gunwalking. In addition, it is believed that Defendant Breuer was trying to facilitate illegal gun purchasers crossing into Mexico with firearms as late as early 2011, around the time he stated that the ATF was not involved in gunwalking. It is believed that additional discovery will reveal additional information about Defendant Breuer's involvement and his acts and omissions that contributed to creating the danger that resulted in the attack on Zapata and Avila and in Plaintiffs' damages.

104. Defendant Tarango, an ATF agent who was working in the Dallas field office at the time, was involved in monitoring the transaction involving Osorio, and he allowed the firearms to walk with full knowledge that they were likely to end up in the hands of violent Mexican drug cartels. Although he had the opportunity to make arrests, interdict the firearms, or at least maintain surveillance thereon, he failed to do so. One of these firearms was later used in the attack on Zapata and Avila. It is believed that Defendant Tarango was also involved in similar situations involving cases in the Dallas office based on the Phoenix model of Fast and Furious. It is believed that additional discovery will reveal additional information about Defendant Tarango's involvement and his acts and omissions that contributed to creating the danger that resulted in the attack on Zapata and Avila and in Plaintiffs' damages.

105. The Gunrunner Defendants acted knowingly and intentionally in violating Plaintiffs' constitutional rights. Whether these defendants intentionally allowed illegally purchased firearms to be illegally trafficked into Mexico or whether the failures of Fast and Furious and parallel cases were due to a failed sting operation, these Gunrunner Defendants engaged in conduct that violated Plaintiffs' constitutional rights, for which Plaintiffs are entitled to recover.

106. At the time the Gunrunner Defendants engaged in these acts and omissions, they did not reasonably believe that their conduct was lawful. Their acts and omissions violated Plaintiffs' clearly established constitutional rights of which a reasonable person would have known. For example, the contours of the state-created danger theory were sufficiently defined such that a reasonable federal government actor should have known his conduct to be a violation of others' constitutional rights. In other words, a reasonable federal agent would have realized that his actions that contributed to the creation of a dangerous environment would likely result in the deprivation of someone's constitutional rights.[2] Similarly, these Defendants' conduct in relation to the gunwalking operations that evolved into a disastrous boondoggle also violated Plaintiffs' rights under Fifth Circuit law.

107. The dangers that these Gunrunner Defendants created proximately caused Zapata and Avila to suffer injuries resulting in damages specified below.

108. The Gunrunner Defendants' conduct rises to the level of gross misconduct due to the willful, wanton, and reckless disregarded for the rights and safety of Plaintiffs. As such, Plaintiffs are entitled to an award of punitive damages against Gunrunner Defendants.

---

[2] To the extent these Defendants will argue that Plaintiffs' constitutional rights were not "clearly established" at the time, Plaintiffs' believe that discovery concerning each of these Defendants' training, ATF training generally, and the geographic locations in which these Defendants have operated will better enable the court to determine this issue.

### B. Civil Conspiracy for Bivens Violations

109. In addition, Gunrunner Defendants entered into a civil conspiracy with each other and agreed to use unconstitutional and unlawful means, through the actions described above, to accomplish an unlawful and unconstitutional purpose to Plaintiffs' detriment.

110. Plaintiffs were and continue to be damaged as a direct and proximate result of the civil conspiracy between and among all Gunrunner Defendants.

111. As a result of the Gunrunner Defendants' conspiracy, Plaintiffs have been damaged as described below.

## VI. *BIVENS* CLAIMS AGAINST MEXICO SUPERVISORS

112. Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all purposes as if fully set forth herein.

113. Plaintiffs seek to recover from Luis Alvarez, Juan Gelista, Jere T. Miles, Anthony Salisbury, and Raul O. Aguilar (hereinafter "Mexico Supervisors") for violations of their Constitutional rights under *Bivens*.

### A. Bivens Claims

114. Plaintiffs Victor Avila, Jr. and Mary M. Zapata, as Administrator of the estate of Jaime Zapata are entitled to recover for violations of the Due Process Clause of the Fifth Amendment, which protects citizens' liberty interest in their own bodily security from violation by federal government action. Similarly, Mary and Amador Zapata, the natural parents of Jaime Zapata are entitled to recover for the deprivation of their constitutional right to a continuing relationship with their son under the Due Process Clause of the Fifth Amendment and Free Association Clause of the First Amendment to the Constitution of the United States.

115. The Mexico Supervisors knowingly created a dangerous environment for Zapata and Avila. Specifically, the Mexico Supervisors ordered Zapata and Avila to travel on a highway that was prohibited for travel—such travel was a violation of policy. The Mexico Supervisors each failed to take the normal precautions for travel by an ICE agent in Mexico. For example, there was very little planning involved, no escort was arranged, Zapata and Avila's vehicle was the only one traveling on this assignment, and on information and belief, the Mexican government was not notified of the planned travel, as is the typical procedure. In addition, the Mexico Supervisors sent Zapata and Avila unescorted on a known dangerous highway in a vehicle that was not properly equipped and indeed was fatally defective. Moreover, the Mexico Supervisors failed to provide Avila any training in how to operate an armored vehicle, much less how to navigate rolling roadblocks in such vehicles. The Mexico supervisors provided no equipment to Zapata and Avila, such as bulletproof vests, which might have given them some protection. On information and belief, many of the acts and omissions of each of the Mexico Supervisors that created or exacerbated the dangerous condition violated safety policies and procedures.

116. The Mexico Supervisors each used their authority to create an opportunity for the cartel members to attack Zapata and Avila that would not have otherwise existed. It is believed that discovery will reveal information about each of the named Mexico Supervisors' involvement and his acts and omissions that contributed to creating the danger that resulted in Plaintiffs' damages. Despite Plaintiffs' diligent efforts, Defendants have actively prevented Plaintiffs' from obtaining additional information about each of these Defendants' personal role in depriving Plaintiffs' their constitutional rights.

117. The dangers that these Mexico Supervisors created proximately caused Zapata and Avila to suffer injuries resulting in damages specified below.

118. At the time the Mexico Supervisors engaged in these acts and omissions, they did not reasonably believe that their conduct was lawful. Their conduct violated Plaintiffs' clearly established constitutional rights of which a reasonable person would know. Indeed, the contours of the state-created danger theory were sufficiently defined such that a reasonable federal government actor should have known his conduct to be a violation of others' constitutional rights. In other words, a reasonable federal agent would have realized that his actions that contributed to the creation of a dangerous environment for Zapata and Avila created an unreasonable risk for the deprivation of these agents' constitutional rights.[3]

119. The Mexico Supervisors' conduct rises to the level of gross misconduct. The acts and omissions demonstrate willful, wanton, and reckless disregarded for the rights and safety of Plaintiffs. As such, Plaintiffs are entitled to an award of punitive damages against the Mexico Supervisors.

### B. Civil Conspiracy for Bivens Violations

120. In addition, the Mexico Supervisors entered into a civil conspiracy with each other and agreed to use unconstitutional and unlawful means, through the actions described above, to accomplish an unlawful and unconstitutional purpose to Plaintiffs' detriment.

121. Plaintiffs were and continue to be damaged as a direct and proximate result of the civil conspiracy between and among all the Mexico Supervisors.

---

[3] To the extent these Defendants will argue that Plaintiffs' constitutional rights were not "clearly established" at the time, Plaintiffs' believe that discovery concerning each of these Defendants' training, ICE training generally, and the geographic locations in which these Defendants have operated will better enable the Court to determine this issue.

122.     Because of the Mexico Supervisors' conspiracy, Plaintiffs have been damaged as described below.

## VII.    CLAIMS AGAINST DEFENDANT FFLs

123.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all purposes as if fully set forth herein.

124.     Plaintiffs bring the following claims against Defendants JJ's Pawn, Off-Duty Armory, and an Unknown FFL Dealer[4] (hereinafter "Defendant FFLs") each of which are Federal Firearm Licensed Dealers and sellers of firearms:

### A.     *Negligence/Negligent Entrustment/Gross Negligence*

125.     Defendant FFLs owed a duty not to sell any firearm for use by another person when the seller knows or reasonably should know that hat the person to whom the firearm is sold is likely to, and does, use the firearm in a manner involving a reasonable risk of physical injury to others.  *See* 15 U.S.C. § 7903(5)(A)(ii).

126.     Moreover, Defendant FFLs owed common law duties to the public, including Plaintiffs, to refrain from creating a dangerous situation where it reasonably appears or should appear to it that others in the exercise of their lawful rights may be injured thereby.

127.     Defendant FFLs likewise had a duty to 1) properly inventory and implement tracking programs; 2) train employees on avoiding unlawful sales and identifying straw purchasers; 3) flag repeat and large quantity sales; and 4) take further preventative measures in conjunction with law enforcement officials to ensure that the these firearms were not being used for unlawful purposes, such as being smuggled to Mexico and to cartels.

---

[4] The identity of the FFL who sold the third weapon involved in the murder of Zapata and injury to Avila is being withheld by the United States. Once this information is revealed, Plaintiffs will seek leave to amend to join this third FFL dealer.

128.     On information and belief, Defendant JJ's Pawn knew or reasonably should have known Riendfliesh and Shaffer were likely to use the firearms in a manner that involved an unreasonable risk of physical injury to others.  JJ's Pawn knew or reasonably should have known that the large quantities of AK-47 variant firearms purchased by Riendfliesh and Shaffer were not for recreational use but instead were purchased to illegally traffic same.  As applies to the present case, JJ's Pawn sold a WASR-10, serial no. 1981MF8477, to Riendfliesh.

129.     On information and belief, Riendfliesh made this purchase as a straw purchaser, immediately transferring the firearm to others who smuggled the firearm into Mexico and into the hands of cartel members.   This firearm, sold by JJ's Pawn, was one of three weapons that breached the vehicle and was used to shoot Avila and Zapata, resulting in the damages set forth below.

130.     On information and belief, Defendant Off-Duty Armory knew or should have known that the AK-47 variant firearms sold to Osorio were straw purchases.  It knew or reasonably should have known that Defendant Osorio would likely use the firearms in a manner that involved an unreasonable risk of physical injury to others.  Nevertheless, Off-Duty Armory sold a Draco bearing serial no. DC-2777-10 to Defendant Osorio.

131.     On information and belief, Riendfliesh made this purchase as a straw purchaser, immediately transferring the firearm to others who smuggled the firearm into Mexico and into the hands of cartel members.   This firearm, sold by Off-Duty Armory, was one of three weapons that breached the vehicle and was used to shoot Avila and Zapata, resulting in the damages set forth below.

132.     On information and belief, Defendant FFLs failed to 1) properly inventory and implement tracking programs; 2) train employees on avoiding unlawful sales and identifying

straw purchasers; 3) red flag repeat and large quantity sales; and 4) take further preventative measures in conjunction with law enforcement officials to ensure that the these firearms were not being used for unlawful purposes, such as being smuggled to Mexico and to cartels. Such failures also contributed to the unlawful sales of the firearms that were used in the attack on Zapata and Avila.

133. Defendant FFLs' breach of these duties constitutes negligence and negligent entrustment, which proximately caused injury to Plaintiffs and resulted in the damages described below.

134. Plaintiffs' injuries resulted from Defendant FFLs' gross negligence, which entitles Plaintiffs to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a).

### B.    *Negligence Per Se*

135. Defendant FFLs' unexcused violations of both Federal and State firearms statutes and regulations, including but not limited to provisions of the Gun Control Act, 18 U.S.C. § 922 *et seq.*, constitute negligence per se for which Plaintiffs are entitled to recover.

136. Among the statutes that Defendant FFLs violated are provisions of 18 U.S.C. § 922. For example, under 18 U.S.C. § 922(b), it is illegal for a dealer to sell any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in the State in which the licensee's place of business is located. Similarly, under 18 U.S.C. § 922(d), an FFL may not sell a firearm if it knows or has reasonable cause to believe that such person is under indictment for or has been convicted of a felony, unlawfully uses controlled substances, who is an illegal alien, or otherwise cannot legally purchase a firearm under the statute. Selling to a straw purchaser—i.e., a person who may legally be able to purchase a firearm but is purchasing for someone who could not do so—is likewise illegal.

137. Defendant FFLs each sold firearm(s) to persons who either could not legally purchase firearms under the Gun Control Act and/or to straw purchasers and the persons for whom the firearms were purchased fall into one of the categories of prohibited purchasers under Section 922. For the reasons set forth above, and those that Plaintiffs believe will become apparent in discovery, the FFLs knew or had reasonable cause to believe that the purchasers either could not legally purchase the firearms and/or were straw purchasers.

138. These provisions, and analogous provisions under state and federal law were designed to protect the public, including Plaintiffs.

139. Defendant FFLs' violation of these statutes therefore constitutes negligence per se. Such negligence proximately caused Plaintiffs' injuries and damages for which they seek recovery.

140. Alternatively, the Defendant FFLs knowingly violated such state and federal statutes in the sales of these firearms that were used in the attack on Zapata and Avila, thereby making them liable for damages under Section 7905(5)(A)(iii).

## VIII. CLAIMS AGAINST STRAW PURCHASERS

141. Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all purposes as if fully set forth herein.

142. Plaintiffs bring the following claims against Defendants Manuel Barba, Otilio Osorio, Ranferi Osorio, Blandon Derrick Shaffer, Kelvin Morrison, Robert Riendfliesh, and John or Jane Doe(s) straw purchaser(s)[5] (hereinafter "Straw Purchasers"):

---

[5] Because the United States will not reveal trace information concerning the third firearm involved in the shooting, Plaintiffs do not yet know the identity of other potential straw purchasers.

### A. Negligence/Gross Negligence

143. Defendant Straw Purchasers owed a duty to not act negligently to create a dangerous situation where it reasonably appears or should appear to him that others in the exercise of their lawful rights may be injured thereby.

144. Defendant Straw Purchasers violated this duty by purchasing firearms to transfer said firearms to criminals who would then smuggle the firearms to Mexico and into the hands of cartel members. The Straw Purchasers knew that these firearms were being acquired for violent, criminal activity. The Straw Purchasers created a dangerous situation through their involvement in acquiring and trafficking these firearms. It should have been apparent to these Straw Purchasers that by supplying firearms to criminals and violent cartels, there was a high risk that those exercising their lawful rights might be injured. Indeed, Zapata and Avila, in the course of lawful conduct, were attacked using these firearms that these straw purchasers trafficked to the cartels in Mexico.

145. Defendant Straw Purchasers' breach of this duty proximately caused damages to Plaintiffs.

146. Plaintiffs' injuries resulted from Defendant Straw Purchasers' gross negligence, which entitles Plaintiffs to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a).

### B. Negligence Per Se

147. Defendant FFLs' unexcused violations of both Federal and State firearms statutes and regulations, including but not limited to provisions of the Gun Control Act, 18 U.S.C. § 922 *et seq.*, constitute negligence per se for which Plaintiffs are entitled to recover.

148.    Among the statutes that Defendant FFLs violated are provisions of 18 U.S.C. § 922 which make it illegal to purchase firearms for a person who cannot legally purchase them and also makes it illegal to be involved in the trafficking of firearms.

149.    These statutes were designed to protect the general public, including Plaintiffs.  . Thus, Straw Purchasers' violation of these statutes constitutes negligence per se.   Such negligence proximately caused Plaintiffs' injuries and damages for which they seek recovery.

## IX.    CLAIMS AGAINST BAE SYSTEMS, INC. AND O'GARA

150.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all purposes as if fully set forth herein.

151.    On the day that they were attacked, Avila and Zapata were in an up-armored Chevrolet Suburban that was outfitted, armored, and modified by BAE Systems Survivability.[6] When the cartel members forced Zapata and Avila to stop the vehicle, Zapata put the vehicle in park, causing the doors to unlock and the heavy armored doors to swing open.  The unexpected opening of the doors and Zapata and Avila's efforts to re-secure themselves in the vehicle gave their attackers the opportunity to fire numerous rounds inside the vehicle.  The attack resulted in the death of Zapata and severe injury to Avila. Accordingly, Plaintiffs assert the following claims against BAE Systems, Inc. and O'Gara:

### A.    *Negligence – Marketing Defect*

152.    Defendants knew or should have known of the potential risk of harm presented by the automatic unlocking feature on up-armored vehicles.  Defendants knew or should have known that the weight of these up-armored doors could cause the doors of the vehicle to open

---

[6] Plaintiffs understand BAE Systems Survivability to be a former division of BAE Systems, Inc., and BAE Systems Survivability transferred its assets and liabilities for the claims set forth herein to O'Gara.

when the doors were unlocked. Moreover, Defendants knew or should have known that these vehicles were designed to be used in dangerous situations in which government agents needed the utmost protection. The risks involved in leaving the auto-unlock feature engaged, which could allow the doors of the vehicle to swing open exposing the agents therein, were reasonably foreseeable to Defendants.

153. Nevertheless, Defendants failed to provide any warnings about this danger or provide any instructions on how to disable the auto-unlock feature or otherwise ensure that the doors would not open when the car was parked in a compromising situation.

154. The lack of any warnings or instructions concerning the propensity of these heavy doors to automatically unlock and perhaps open when the vehicle was in park created an unreasonable danger. Alternatively, if any such warnings or instructions were given, they were inadequate.

155. In addition, based on information and belief, Defendants failed to warn the United States, its customer, about the dangers in the use of the vehicle and this auto-unlock feature, though Defendants knew of the problem and the United States did not when it accepted delivery of the modified vehicles.

156. The auto-unlock feature and the propensity for the heavy doors to swing open when unlocked allowed the cartel members to breach the vehicle and it was a contributing cause of the injuries suffered by Plaintiffs.

### B. *Design Defect*

157. At the time that Defendants armored and otherwise modified the vehicle in which Zapata and Avila were attacked, there was a safer alternative design that would have prevented the doors from unlocking and opening. Specifically, Defendants could have simply permanently

disengaged the auto-unlock feature, preventing the vehicle from unlocking automatically when put in park. This would have prevented or significantly reduced the risk of Zapata's death and Avila's injuries. Moreover, disengaging this feature was economically and technologically feasible.

158. Defendants' failure to disengage the auto-unlock feature was a producing cause of Plaintiffs' injuries and the damages for which they seek recovery.

### C. Negligent Undertaking

159. Defendants undertook the project of up-armoring and otherwise modifying government vehicles for use by federal agents in dangerous or potentially dangerous circumstances.

160. In doing so, Defendants recognized or should have recognized the undertaking as necessary for the protection of the other's person or things. Indeed, Defendants knew that the purpose of the modifications was to provide ultimate protection to federal agents and officials who were in compromising situations.

161. Defendants failed to exercise reasonable care to perform this undertaking. Specifically, Defendants failed to ensure that the weight added by the armor did not cause the vehicle to be unreasonably dangers in other aspects. This would include ensuring that the doors do not automatically open if the car is in park, thus negating all benefits of the armor put in the doors. By failing to disengage the auto-unlock feature, Defendants did not exercise reasonable care in performing its undertaking to make a safer vehicle for federal agents.

162. Defendants' failure proximately caused Zapata's death and Avila's injuries as well as the damages for which Plaintiffs seek recovery.

## X. FOIA CLAIMS AGAINST DOJ AND DHS

163. Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all purposes as if fully set forth herein.

164. Plaintiffs bring this action under the Freedom of Information Act, 5 U.S.C. § 552, for injunctive and other appropriate relief and seeking the disclosure and release of agency records improperly withheld from Plaintiffs by Defendants DOJ and DHS.

165. Defendant DOJ is a Department of the Executive Branch of the United States Government and includes component entities FBI, DEA, ATF, and the Office of Information Policy (OIP). DOJ is an agency within the meaning of 5 U.S.C. § 552(f).

166. Defendant DHS is a Department of the Executive Branch of the United States Government and includes ICE. DHS is an agency within the meaning of 5 U.S.C. § 552(f).

167. By a letter directed to the U.S. Attorney's Office for the Southern District of Texas, FBI San Antonio Division, U.S. Immigration and Customs Enforcement in Harlingen, Brownsville, and San Antonio dated June 14, 2011, Plaintiffs submitted Freedom of Information Act (FOIA) requests for documentation related to the Zapata and Avila incident, which included specific requests for FBI 302s, DEA 6s, ICE ROIs, ATF documentation, and any investigative reports linked to the incident.

168. By a separate letter, each agency denied the requests. DOJ, through the OIP in a letter dated January 20, 2012, denied the appeal for the FBI requested documents. The OIP denied other requests in a letter dated June 6, 2012. The Department of Homeland Security, through ICE, denied the requested documents in a letter dated October 20, 2011.

169. Plaintiffs have exhausted the applicable administrative remedies with respect to their FOIA requests to Defendants DOJ and DHS.

170. DOJ and DHS have wrongfully withheld the requested records from Plaintiffs.

171. Plaintiffs request that this Court order DOJ and DHS to 1) disclose the requested records in their entireties and make copies available to Plaintiffs; 2) provide for expeditious proceedings in this action; 3) award Plaintiffs their costs and reasonable attorneys' fees incurred in this action; and 4) grant such other relief as the Court may deem just and proper.

## XI.  WRONGFUL DEATH CAUSE OF ACTION

172. Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all purposes the same as if fully set forth herein.

173. In conjunction with those claims already pleaded, Jaime J. Zapata suffered fatal injuries because of multiple 7.62 mm gunshot wounds to his body fired from multiple AK-47 variant firearms.  Agent Zapata's parents, Plaintiffs Mary and Amador Zapata, are entitled to recover damages from Defendants for the loss of companionship, mental anguish, funeral, and burial expenses they incurred, loss of support, loss of care and affection, and exemplary damages.  All of the injuries and damages, as herein alleged are in an amount in excess of the Court's minimum jurisdictional limits for which Plaintiffs sue.  Plaintiffs incorporate each allegation as set forth herein above, repeat, and re-allege such allegations hereinafter with the same force and effect.

## XII.  TEXAS SURVIVAL STATUTE

174. Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all purposes as if set forth herein verbatim.

175. In conjunction with those claims already pleaded, Plaintiff Mary M. Zapata, in her capacity as Administrator of the Estate of Jaime J. Zapata, is entitled to recover damages on behalf of the Estate for the physical pain and mental anguish suffered by Jaime J. Zapata prior to his death; for the reasonable costs of funeral, burial, and related expenses for the decedent; and for all damages to which the Estate is entitled under the Texas Survival Statute.

## XIII. DAMAGES

176. Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all purposes as if fully set forth herein.

177. Because of Defendants' acts and omissions as set forth above, Jaime Zapata was killed. Plaintiffs Amador and Mary Zapata sustained substantial and permanent injuries as a direct and proximate result of the wrongful death of their son, Jaime Zapata. Plaintiffs Amador and Mary Zapata's injuries include, *inter alia*, past and future loss of love, income, affection, companionship, care, protection, and guidance. They are experiencing disability, pain, anguish, sorrow, mental suffering, extreme stress, shock, and physical illness.

178. Moreover, because of Defendants' acts and omissions as set forth above, Plaintiff Victor Avila, Jr. sustained multiple gunshot wounds causing past and future pain and extreme physical and mental anguish, permanent impairment, and disfigurement.

179. In addition, Defendants' acts and omissions following the attack, including the deliberate cover-up, deception, and retaliation, caused and continue to cause injury to Plaintiffs.

180. All of the Plaintiffs will suffer for the foreseeable future, if not for the balance of their natural lives.

181.     Plaintiffs have suffered losses and damages in a sum that exceeds the minimum jurisdictional limits of the Court. They request any and all actual, pecuniary, consequential, and special damages both past and future, to which they are entitled.

182.     The conduct described in the preceding paragraphs was committed in a manner such that Plaintiffs seek exemplary damages in such amount that may be awarded in the discretion of the jury.

## XIV.   JURY DEMAND

183.     Demand has already been made for a jury to decide all fact issues in this case, and Plaintiffs have tendered the jury fee.

## XV.   CAPACITIES/CONDITIONS PRECEDENT

184.     Plaintiffs bring claims against Defendants in all capacities in which they are liable.   All conditions precedent necessary to bring this suit have occurred or have been performed.

## XVI.   PRAYER

WHEREFORE, Plaintiffs pray that Plaintiffs have and recover from Defendants the following:

A.     Economic and noneconomic damages or actual damages and exemplary damages in excess of this Court's minimum jurisdictional limits;

B.     Prejudgment interest at the highest legal rate allowed by law;

C.     Post-judgment interest on said judgment until paid in full;

D. Court costs;

E. General relief;

F. Any and all other relief entitled to by the Plaintiffs.


Respectfully submitted,


By: /s/ *Benigno (Trey) Martinez*
Benigno (Trey) Martinez
Tomas F. Tijerina
**LAW OFFICE OF BENIGNO (TREY)
MARTINEZ, PLLC**
**LAW OFFICE OF TONY MARTINEZ, PC**
1201 E. Van Buren
Brownsville, Texas 78520
Telephone: (956) 546-7159
Facsimile: (956) 544-0602

**E. Michael Rodriguez**
State Bar No. 00791553
Federal ID 18759
50 Morrison Rd., Suite A
Brownsville, Texas 78520
Telephone: (956) 574-9333
Facsimile: (956) 574-9337
**Daniel G. Gurwitz**
State Bar No.00787608
Federal ID 16895
**Erin A. Hudson**
State Bar No. 24059978
Federal ID 1101277
**Charles W. Downing**
State Bar No. 24069631
Federal ID 1048595
**ATLAS, HALL & RODRIGUEZ, LLP**
818 W. Pecan
McAllen, Texas 78501
Telephone: (956) 682-5501
Facsimile: (956) 686-6109

Raymond L. Thomas
**KITTLEMAN, THOMAS &**
**GONZALES, PLLC**
4900-B North 10th Street
McAllen, Texas 78504
Telephone: (956) 686-8797
Facsimile: (956) 630-5199

Magdalena Villalobos
**RAD LAW FIRM**
2001 Beach Street, Suite 600
Fort Worth, Texas 76103
Telephone: (817) 543-1990
Facsimile: (817) 543-1319

**COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

On October 1, 2013, the undersigned counsel certifies that all counsel of record have been served a copy of the foregoing document in compliance with the Federal Rules of Civil Procedure via the court's electronic filing system, certified mail, and/or facsimile.

/s/     *Benigno (Trey) Martinez*