# DEFENSE EXHIBIT 1

Martinez, Barrera & Martinez, LLP
*Attorneys at Law*
1201 E. Van Buren
Brownsville, Texas 78520


KITTLEMAN,
THOMAS
& GONZALES, LLP
ATTORNEYS AT LAW

RAD LAW FIRM
A PROFESSIONAL CORPORATION
2001 BEACH STREET, SUITE 600
FORT WORTH, TEXAS 76103-2314
THEFIRM@RADLAWFIRM.COM

June 14, 2012

# FORM 95 NOTICE OF CLAIM
## AGAINST THE UNITED STATES OF AMERICA
(Pursuant to 28 U.S.C. §§ 2401(b) and 2671)

Responsible Federal Agencies:    United States Bureau of Alcohol, Tobacco, Firearms and
Explosives; U.S. Immigration and Customs Enforcement;
Federal Bureau of Investigation

Claimant:    Victor Avila, Jr.

Benigno "Trey" Martinez
Texas Bar No. 00797011
MARTINEZ, BARRERA & MARTINEZ
1201 E. Van Buren Street
Brownsville, Texas 78520
(956) 546-7159
(956) 544-0602 (facsimile)

ATTORNEY FOR CLAIMANT

Raymond L. Thomas
Texas Bar No. 19865350
KITTLEMAN, THOMAS & GONZALES
4900-B North 10th Street
McAllen, Texas 78504
(956) 686-8797
(956) 630-5199 (facsimile)

ATTORNEY FOR CLAIMANT

Magdalena A. Villalobos
Texas Bar No. 24029426
RAD LAW FIRM
2001 Beach Street, Suite 600
Fort Worth, Texas 76103
(817) 543-1990
(817) 543-1319 (facsimile)

ATTORNEY FOR CLAIMANT

**Martinez, Barrera & Martinez, LLP**
*Attorneys at Law*
1201 E. Van Buren
Brownsville, Texas 78520



KITTLEMAN,
THOMAS
& GONZALES, LLP

ATTORNEYS AT LAW

RAD LAW FIRM
A PROFESSIONAL CORPORATION
2001 BEACH STREET, SUITE 600
FORT WORTH, TEXAS 76103-2314
THEFIRM@RADLAWFIRM.COM

June 14, 2012

## CERTIFIED MAIL – RETURN RECEIPT REQUESTED

U.S. Immigration and Customs Enforcement
Director John Morton
500 12th St., SW
Washington, D.C. 20536

U.S. Immigration and Customs Enforcement
Office of Chief Counsel
500 12th St., SW
Washington, D.C. 20536

U.S. Immigration and Customs Enforcement
Jerry Robinette
Special Agent in Charge
ICE San Antonio Division
40 N. E. Loop 410, Suite 501
San Antonio, TX  78216

U.S. Department of Alcohol, Tobacco, Firearms and
Explosives
Melvin D. King
Special Agent in Charge
Houston Field Division
5825 N. Sam Houston Pkwy, Suite 300
Houston, TX 77086

U.S. Department of Alcohol, Tobacco, Firearms and
Explosives
Acting Director B. Todd Jones
99 New York Avenue, NE
Washington, D.C. 20226

U.S. Department of Alcohol, Tobacco, Firearms and
Explosives
Office of Chief Counsel
99 New York Avenue, NE
Washington, D.C. 20226

Federal Bureau of Investigation
Armando Fernandez
Special Agent in Charge
FBI San Antonio Division
5740 University Heights Boulevard
San Antonio, TX 78249

Federal Bureau of Investigation
Director Robert S. Mueller, III
935 Pennsylvania Avenue, NW
Washington, D.C. 20535

Federal Bureau of Investigation
Office of Chief Counsel
935 Pennsylvania Avenue, NW
Washington, DC 20535

U.S. Department of Justice
Eric H. Holder, Jr.
Attorney General of the United States
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

U.S. Department of Justice
Kenneth Magidson
United States Attorney
Southern District of Texas
1000 Louisiana, Ste. 2300
Houston, TX 77002

Office of International Affairs
DHS/HSI/OIA
Acting Director Peter S. Vincent
Former Director Luis Alvarez
800 N. Capitol St. #300 NW
Washington, D.C. 20536

**FORM 95 NOTICE OF CLAIM**
**AGAINST THE UNITED STATES OF AMERICA**
**(Pursuant to 28 U.S.C. §§2401(b) and 2671)**

| | |
|---|---|
| Responsible Federal Agencies: | United States Bureau of Alcohol, Tobacco, Firearms and Explosives; U.S. Immigration and Customs Enforcement; and Federal Bureau of Investigation |
| Claimants: | Victor Avila, Jr. |
| Address: | c/o Benigno (Trey) Martinez   Magdalena A. Villalobos 1201 E. Van Buren   2001 Beach St., #600 Brownsville, TX 78520   Fort Worth, Texas 76103 |
| Date of the Incident: | February 15, 2011 and ongoing since at least Jan. 2010 |
| Amount of Claim: | $12,500,000.00 |

## I.    REPRESENTATION

These firms have been retained by Victor Avila, Jr. in furtherance of his negligence and intentional infliction of emotional distress claims against the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"); the U.S. Immigration and Customs Enforcement ("ICE"); and the Federal Bureau of Investigation ("FBI") arising out of their wrongdoing that led to the shooting of ICE Special Agent Victor Avila, Jr. Their failures were not only negligent, but in violation of their own policies and procedures.

Included in this notice of claim is a completed Department of Justice Standard Form 95 at **Tab 1**, and a copy of the representation agreement between Victor Avila, Jr. and the undersigned attorneys at **Tab 2**. An ATF Significant Information Report is at **Tab 3**.

## II.    OVERVIEW

On February 15, 2011, ICE Special Agents Jaime J. Zapata and Victor Avila, Jr. followed orders from their supervisors to drive from Mexico City in an Armored Suburban owned by the United States to San Luis Potosi to meet their Monterrey Office counterparts and pick up boxes of "sensitive equipment" and bring them back to the U.S. Embassy where the two were assigned to the ICE Mexico City Attaché Office. The trip required the agents to drive down a stretch of Mexico Highway 57 known to be patrolled and controlled by a notorious and ruthless drug cartel known as "Los Zetas". Moreover, the drive to San Luis Potosi would require the agents to cross from one Drug Trade Organization's ("DTO") territory into territory patrolled and controlled by another DTO, heightening the danger to the agents even more. Ignoring a Written Directive specifying the extraordinary dangers of this area and the concerns expressed by several agents,

1

the supervisors required Jaime and Victor to make this dangerous trip. The concern expressed by other agents was that the trip would unnecessarily risk the lives of two young agents. The "sensitive equipment" could have easily been shipped by air, or land with escort, in what is known as a Diplomatic Pouch through the Diplomatic Courier Service assigned to the Embassy.

Jaime and Victor would encounter at least two vehicles driven by cartel gunmen, who forced the agents off of the road and boxed them in to a complete stop. When Jaime placed the vehicle in park, the Suburban's doors unlocked automatically and unexpectedly. This flawed feature of an armored vehicle outfitted by global defense contractor BAE Systems gave easy access to the agents. The gunmen simply opened the driver's door. In the struggle to close and lock the door, a window was inadvertently lowered and the agents were forced to withstand an onslaught of gunfire from a 7.62 mm AK-47 styled Draco handgun ("Draco") and a 7.62 mm WASR-10 AK-47 type assault rifle ("WASR-10"), among other weapons. After securing the vehicle, the gunmen fired another ninety plus rounds at the SUV and then fled the scene. Jaime bled to death and Victor called for help.

The Draco murder weapon was purchased by Otilio Osorio from Off-Duty Armory based in Joshua, Texas and sent to Mexico by Otilio Osorio, his brother Ranferi Osorio, and their next door neighbor, Kelvin Morrison. The WASR-10 was purchased at JJ's Pawn Shop in Beaumont, Texas by Robert Riendfliesh, along with nine other assault rifles, on behalf of Manuel Barba, a drug dealing weapons trafficker for "Los Zetas." A third weapon that was also used against the agents was recovered and traced by ATF, but the results of those tests have been withheld by the agency. See **Tab 3**. A Texas based operation similar to the infamous "Operation Fast and Furious" is responsible for allowing these weapons to walk into the hands of known killers.

Victor was attacked and shot by narco-traffickers. But, the reckless acts and omissions by ICE, ATF and FBI created the opportunity for the attack to occur. But for the contributing conduct of ICE, ATF and FBI, the attack would not have occured. The U.S. Government is liable to Victor Avila, Jr. for the damages he and his family have suffered and continue to suffer. Victor Avila, Jr. will resolve his claim for the sum certain amount of $12,500,000.

2



### III.    GUN WALKING AND ITS CONSEQUENCES

The United States, in what is seemingly an attempt to dismantle the Mexican Cartels, began allowing firearms to be taken across the border into Mexico and in the hands of the cartels. These drug cartels seek to arm themselves with high powered assault weapons, which are purchased in the United States and under the direct supervision and authority of the United States Government.  Current U.S. firearms laws govern the possession and transfer of firearms, known as "gun trafficking." Several federal statutes govern U.S. commerce of firearms domestically and internationally, such as the Arms Export Control Act of 1976 and the Export Administration Regulation (EAR).  Generally, Defendants are prosecuted for violating these laws to the fullest extent. However, in recent years, the U.S. Government has been implicit in actively providing or allowing firearms to be delivered to the Mexican drug cartels. These cartels use straw purchasers in order to ultimately obtain the weapons sought. In late 2009, ATF officials stationed in Mexico began to notice guns appearing in violent crimes scenes that were directly traced to the ATF's Phoenix Field Division. ATF

UNITED STATES OF AMERICA

v.

JULIAN ZAPATA ESPINOZA,
also known as "Piolin"

Defendant.

CRIMINAL NO. 02-11-111

VIOLATIONS:

18 U.S.C. §§ 1114 & 1111
(Murder of Officer or Employee
of the United States)

18 U.S.C. §§ 1114 & 1113
(Attempted Murder of an Officer
or Employee of the United States)

18 U.S.C. §§ 1116(a) & 1113
(Attempted Murder of an
Internationally Protected Person)

18 U.S.C. §§ 924(c) & 924(j)(1)
(Using, Carrying, Brandishing and
Discharging a Firearm During and
in Relation to a Crime of Violence
Causing Death)

18 U.S.C. § 2
(Aiding and Abetting and Causing
an Act to Be Done)

3

intelligence analyst alerted Darren Gil, Attaché to Mexico, and Carlos Canino, Deputy Attaché,



and they likewise communicated their worries to D.C., but to no avail. ATF personnel in Mexico were denied crucial information that directly involved their duties. The high-risk tactics of cessation of surveillance, gun-walking, and non-interdiction of weapons that ATF used in its operations went against the core of ATF's mission, as well as the training and field experience of its agents. Other federal agencies aware and/or directly involved in these perverse tactics include ICE, DEA, and FBI. The denials of gun-walking continue instead of the Agencies setting the record straight. The inappropriate actions of our Federal Agencies have caused injuries, deaths, and will continue to have severe impacts on our society and agents.

## A. Julian Zapata Espinoza aka "Piolin"



Julian Zapata Espinoza, also known as "Piolin," an alleged chief with the drug cartel named "Los Zetas," was recently extradited from Mexico to the United States to face charges for his alleged participation in the murder of Special Agent Jaime Zapata and the attempted murder of Special Agent Victor Avila, Jr. On April 19, 2011, a federal grand jury in the United States District Court for the District of Columbia returned a four-count indictment against Espinoza for several criminal violations, including the murder of Jaime Zapata.

## B. Osorio Brothers

Otilio Osorio was one of the straw purchasers of the weapons used in the murder of ICE Agent Jaime Zapata and the attack and injuries sustained by Victor Avila, Jr. in February of 2011. ATF ballistics and tracing analysis found that on October 10, 2010, Osorio purchased the AK-47 styled Draco weapon used to murder Agent Zapata from Joshua, Texas based Off-Duty Armory. Approximately two (2) months before this straw purchase by Osorio occurred, in



August of 2010, ATF reviewed summaries of multiple weapons sales to Osorio. On September 17, 2010, ATF traced trafficked weapons to Osorio's brother and co-habitant, Ranferi Osorio, as well as the Osorio brothers' next-door neighbor, Kelvin Morrison. With this combined information, ATF had an opportunity

to immediately shut down the Osorio brothers' home gun trafficking operation and prevent the October 2010 sale of the Draco murder weapon to Otilio Osorio. Soon thereafter, on November 9, 2010, ATF witnessed the Osorio brothers providing 40 weapons with obliterated serial numbers to an ATF informant for the purpose of trafficking the weapons to Mexico. None of these men were arrested for another three and a half months, in late February 2011, after a separate ATF trace report linked the Osorio brothers' gun trafficking operation to the murder of Agent Zapata. There have been no responses as to why these individuals were not questioned or arrested at an earlier date.

### C. Manuel Barba



Records further indicate that ATF opened a case against Manuel Barba in June of 2010, entitled "Baytown Crew". The ATF file was opened against Barba due to information ATF received about the indicted and known drug dealer's weapons dealing. Approximately two (2) months later, on August 20, 2010, Barba took possession of a WASR-10 AK-47 type semi-automatic assault rifle (via straw purchaser Robert Riendfliesh, and JJ's Pawn Shop), which was later trafficked to Mexico and used against Agents Zapata and Avila on February 15, 2011. It was recovered by Mexican authorities along with the Draco murder weapon and confirmed by ATF ballistics and tracing analysis as a weapon also fired on the agents. By no later than October of 2010, ATF knew that Barba was obliterating serial numbers on weapons, the possession of which is a prosecutable offense, and that the guns were destined for the Zetas drug cartel. ATF was also aware that Barba was still under indictment for a 2006 state drug case, and thus had been unlawfully receiving firearms while under indictment the entire time. However, a warrant was not issued for Barba's arrest in this case until February 14, 2011, the day before the attack against Agents Zapata and Avila.

### D. Avila and Zapata

In February of 2011, Victor Avila, Jr. and Jaime Zapata were stationed at the U.S. Embassy in Mexico City. In the late afternoon of February 14, 2011, Agent Avila's OIA ICE Supervisor, Juan Gelista, orders him to take Agent Zapata and pick up some boxes of sensitive equipment from Monterrey, Mexico the next morning, after another agent refused to go. Avila voiced



his concerns and objections to Gelista about picking up and transporting boxes in such hostile



territory when the Diplomatic Courier Service (DCS), with them at the Embassy, was created, trained, and tasked to convey and protect sensitive U.S. materials in transit abroad. Packages such as these were transported every day by air under the supervision of DCS without imminent danger to any U.S. personnel. Agent Avila explained to his supervisor how Jose "Bobby" Silva, Assistant Attaché for ICE, stationed in Monterrey, informed Avila and Zapata that the stretch of Highway 57 they would travel on was very dangerous and how cartel activity had recently been observed in that area. Moreover, there was a Written Directive stating that no U.S. personnel were to travel in that area.

Supervisor Gelista then approached and even interrupted a meeting between Attaché Jere Miles, Deputy Attaché Anthony Salisbury, and others to inform them of Avila's objections. Salisbury walked out of the meeting to address Gelista, appeared frustrated by the interruption and reasonable objections, and refused to make any changes to the plans. Salisbury stated, "I am not aware of any security issue; this is the first I hear of it." Salisbury shut down the idea of simply shipping the equipment via Diplomatic Pouch with DCS without offering any reason other than that he hadn't heard of any danger in that area. Apparently, he was the only agent in

Mexico that didn't know about the recent violence and dangers between Mexico City and Monterrey as rival drug cartels warred with one another and the Mexican Government. Avila and Zapata would be driving through territory patrolled and controlled by the Zetas.



ICE Agent Rigoberto "Rigo" Perales, would meet the two in San Luis Potosi, halfway between Mexico City and Monterrey. Perales had earlier informed

6

the trip planners at the Mexico City Embassy, including Agent Richard Sean Fitzgerald (Fitzi), that there had recently been "several skirmishes between federal forces and DTO's [drug trafficking organizations] in the city of SLP [San Luis Potosi] and Zacatecas." All of these legitimate concerns voiced by multiple agents were set aside by Salisbury, and Agents Avila and Zapata were required to follow the orders. They had to risk their lives over some boxes of equipment. For no apparent reason, loading the boxes on an airplane and flying them to Mexico City, the regular practice and custom at the Embassy, was not appropriate here. ICE leadership at the Embassy somehow instead believed that sending two ICE Agents alone in an Armored Chevy Suburban, a vehicle that attracts attention and presents a crime of opportunity or assassination to roaming cartel thugs, was smarter. The cartels know that the only people who drive that kind of vehicle are government officials, wealthy elites, and powerful cartel leaders, who are exactly the kind of people they target. The arbitrary and capricious orders would lead to Zapata's death and Victor's extensive injuries.

Agents Avila and Zapata met Agent Perales at KM 100 near San Luis Potosi, and they packed the equipment in the Armored Chevy Suburban. There were so many boxes that they had to be packed very tight and all the way up to the back of the front seats, which caused little to no mobility in the vehicle and little to no visibility out of the back of the vehicle. During the return trip, Agents Avila and Zapata were forcibly stopped by cartel gunmen in two separate vehicles. Agent Zapata placed the



Suburban in park, believing they would be protected by the vehicle's armor from the gun wielding thugs. But when Zapata placed it in park, all of the Suburban's doors automatically unlocked allowing the gunmen to simply open the door. Agents Avila and Zapata attempted to shut the door and were surrounded by the gunmen, who were able to pry their guns through a small opening in the window of the vehicle, which had been lowered during the struggle to lock and close the door. The gunmen then began firing into the vehicle, severely wounding Avila and mortally wounding Zapata. Zapata, after being shot several times, was able to drive through the roadblock and momentarily escaped the gun fire. Zapata then drove off the road where he eventually lost consciousness and bled to death, having been shot in the femoral artery.

Upon an investigation into the circumstances surrounding Zapata's death and Avila's injuries, it was discovered that the guns used in the attack were effectively provided to the Zetas by the U.S. Government. ATF's Operation Fast and Furious allowed and encouraged weapons to enter Mexico. Similar operations have been found to exist or formerly exist in multiple states, including Texas, where weapons such as the Draco and WASR-10 weapons made their way

across the border into Mexico. The weapons used to murder Zapata and severely wound Avila were shipped through the United States with ATF's knowledge of the shipment, in a combined effort with other agencies, and in a foolish and ridiculous attempt to catch a "big fish." At the very least, ATF knew the impact of failing to shut down the Osorio brothers' home gun trafficking operation and apprehend Barba, a known drug dealer who was illegally possessing weapons, obliterating their serial numbers, and shipping them to the Zetas in Mexico while under indictment. Osorio and Barba were either supplying weapons to the Zetas with ATF's full knowledge, or doing so right under their noses. Other U.S. agencies aware and/or involved in this foolish and troubling scheme include ICE, DEA, and FBI. Said agencies are collectively referred to as "The Agencies". Data of a third weapon recovered by authorities has yet to be released.





## IV.    BACKGROUND OF VICTOR AVILA, JR.

### A. Victor Avila, Jr.

The definition of a hero describes him as a man of distinguished courage or ability and admired for his brave deeds and noble qualities. Victor Avila, Jr. has often been referred to as a hero, but what really makes him a true hero is that at least in his own mind, he is not a hero. He does not want the credit nor does he want to be in the spotlight. Victor did not think about being a hero. He just did what was instinctive to him and wanted to save his friend. He rose to the occasion and did what he thought was right. He feels the true hero is his friend who did not make it that day--the one who at the end made the ultimate sacrifice.

 Victor Avila, Jr. was born on August 8, 1972 in El Paso, Texas, a border city directly north, across Ciudad Juarez, Chihuahua, Mexico. Victor was not alone when he came into this world as he was born a fraternal twin. Victor was born only three minutes after his twin sister, Magdalena Avila Villalobos ("Nena"). Therefore, technically he is regarded as the youngest of  three children. The twins have an older sister, Jannette Quintana. She was born June 4, 1968.

9

Victor was born healthy and happy. He had a perfectly round head with a smile that would light up a room. He and his twin sister Nena would form a very tight and unique bond and grow up in a happy household. Victor was a small boy growing up. His small stature often made him the shortest student in his classroom. This was hard for Victor in elementary, as he was often picked on by other students.

Victor knew that as the only male sibling, he would have to look after his sisters. During the earlier years of his childhood, he spent a lot of time with his twin sister. Perhaps not by choice, but the twins were always together and enjoyed each others company. They would walk home from school together and always keep an eye out for each other. It was Jannette who, as the older sibling, would keep an eye on the twins. They were a close knit family who enjoyed spending quality time together.

The Avila children had a humble yet normal and loving upbringing. Victor was a typical boy playing football and riding bikes. When the twins were 7 years old, their  parents bought their first home. This would be the home where many memories were made. This is the home where the kids were raised and after 32 years, Victor's parents still reside in this same home. Victor gets that same feeling of home and comfort every time he visits. The stability and love in the home were the moving factors for Victor's future success. He always knew that his parents worked very hard to make ends meet so he never complained and did not take anything for granted.

When Victor was 11 years old, his father, Victor Sr., enrolled him in a Shotokan Karate class at the local recreation center. Although skeptical at first, Victor grew to love Karate. He enjoyed the hard work and dedication. It gave him strength and confidence. By age 16, he earned his Black Belt. The discipline and dedication to his Karate transformed Victor into a very strong and confident man. His mom Ms. Magdalena Avila, remembers Victor sustaining serious injuries during some of his more intense workouts and competitions. She would try and soothe his bruises and massage his sore legs. She would rather not see  Victor practice, because she hated to see her son undergo such strenuous training wherein his body would often be injured.

 By the end of junior high no one would dare pick on Victor. He had earned respect from others. Perhaps it took a fight or two, but never was Victor a violent man. He would never instigate a fight. He knew the power of his hands and knew his skills as a black belt should only be used in a matter of life or death. He promoted peace and rarely encountered "trouble." Although of a serious nature, Victor has a great sense of humor and is very funny. He has high morals and strong values which make him a great friend. At a young age, Victor displayed his leadership skills as the neighborhood kids would follow him and look up to him. Some of his closest friends today are those from his childhood. His integrity and honesty has given him the ability to form strong long lasting relationships.

10



Victor graduated from Del Valle High School in 1990 and promptly enrolled as a full-time student at the University of Texas at El Paso (UTEP). Victor paid his way through college by maintaining a part-time job. During his studies at UTEP, he became interested and joined the Criminal Justice Society. He was very active in this organization. In 1994, Victor completed his internship with the U.S. Customs Service. The daily interaction with bridge inspectors, immigrations officers, import specialists and special agents allowed Victor the opportunity to learn so much and gave him a new goal. Victor knew he wanted to be a U.S. Customs Special Agent. He knew he would have to expand his resume and work very hard to reach his goal, but he knew well where he was headed and he was prepared to undertake the challenge. In 1996, Victor graduated from UTEP with a Bachelor of Science in Criminal Justice.



## B. Victor and His Parents

Victor's father, Victor Avila was born on July 4, 1944. He was an only child and his parents divorced when he was very young. His mother never remarried again. Times were tough in the 1940's. Mr. Avila was born in Chihuahua, Mexico. He was a smart boy who learned to make the most out of life without having much. He had big dreams and knew that the only way he was going to accomplish those dreams and provide for a future family was to immigrate to the United States.

11

Victor's mother, Magdalena Avila was born Magdalena Ramos on December 22, 1945. She is one of five sisters. She was born and raised in Chihuahua, Chihuahua Mexico. Mrs. Avila's parents were married for over 50 years! They would have been married longer but for her father succumbing to cancer. She was very close to her father and his death caused great pain to Victor and the family as a whole. Mrs. Avila's father  made a living as a saddle maker. He had his saddle shop in the basement of their home. He was a very talented man and his work provided for the five sisters and his wife, but it was a humble home. Mrs. Avila's mother often made the girls' clothes to save money.

 The Ramos household was a strict one. Order and discipline was their way of life. Each sister was held to the highest standard when it came to cleaning, cooking, sewing and studying. The ladies did attend school, but Ms. Avila was not able to become a nurse like she dreamed. Her father did not allow her to go to nursing school because that meant she would have to ride the bus alone at night. So he said no. Mrs. Avila says that obedience was not a choice and so respectfully complied.

It was late 1966 when fate brought Victor and Magdalena together. Mr. Avila had been in the Chihuahua area visiting when he and some cousins went to the local afternoon matinee. Magdalena and her cousins went to the same movie and both met outside the movie theatre. They married six months later and moved to Los Angeles, California. Soon after their arrival to the United States, they had their first daughter, Jannette. When Jannette was about four years old, they decided to move to Texas and lived a short while in Ciudad Juarez while they worked on their U.S. Residency. Finally when their  residency was granted, they settled in El Paso, Texas. Mr. Avila has always been a hard working man and both of them eventually became U.S. Citizens. Nevertheless, Mr. Avila made a living as a carpenter and/or truck driver and often times had two jobs at once to make ends meet. When news came that Mrs. Avila was pregnant for the second time, Mr. Avila was full of joy. He knew that he would have to work very hard to provide for the new addition to the family. The year was 1972 and sonograms were fairly



12

new. Although the pregnancy was confirmed, neither the doctor nor the Avila's knew that Mrs. Avila was pregnant with twins! It was at the time of delivery that the doctor exclaimed, "there are two of them!" Mr. Avila was ecstatic that he would be the proud father of two more kids, but concern quickly came upon him as they had only prepared for one child. It was not but a few hours later when the staff at Thomason Hospital (where the twins were born), that doctors, nurses and staff surprised the Avila's with a second car seat, baby clothes, bottles and diapers. The Avila's left the hospital a few days later ready for the twins. They had named their twins after themselves which later proved to be pleasant yet confusing.





Mr. & Mrs. Avila have been married for 43 years. They have been excellent parents and the Avila family still enjoys spending time together. Not long ago, they had the opportunity to take a trip together and they describe it as being one of the best times they have had together. It is now that Victor realizes how much he resembles his father personality wise. Mr. Avila is a very serious man but so funny and loves to joke around. Victor and his parents care much about Victor and they pray for him everyday because they know his job can be dangerous. They soon would find out how dangerous his job really was.

### C. Victor and His Sisters

The three Avila siblings have always been very close. Always courteous and thoughtful of each other's feelings they still had their usual sibling rivalries. Jannette is almost five years older than the twins. She has always been a fantastic older sister. She helped their mother extensively when the twins were just babies. She loved her new baby brother and has always looked out for him. Throughout the years, Jannette has shared in Victor's accomplishments and hardships. She has been there during Victor's biggest and most important moments of his life. She has always been supportive of Victor's career choice in law enforcement. Now married with three children, she is a successful career in property management and keeps in close touch with her brother.





Victor's twin sister, Nena, is a lawyer who lives far away from Victor as well. They too keep in touch and speak regularly on the phone. In December of 2009, she was diagnosed with breast cancer. This was devastating news for the family and it hit Victor especially hard. He was living in Mexico City at the time and could not travel, but upon receiving the news, he immediately made arrangements to fly home to see his twin sister. He knew that she would be undergoing a surgery and he wanted to spend time with

13



her. When talking to Nena about the surgery, he offered his support and reminded her that very soon she would be okay. She explained to him that she was not looking forward to the horrible scars that would remain on her body. His heart hurt for her. He knew that her life had changed forever, but he also knew that she was a strong woman. Before leaving that night, he hugged her and said to her, "remember that your scars will be your badges of courage." This was a strong statement and it resonated with Nena as she thought about it that night. Months later after the surgery and after she healed, she remembered what Victor had said to her. He was right. She thought of her courage and strength every time she'd see her scars. Little did she know that Victor would soon go through a tragic event that would change his life forever and that he too would carry scars as his badges of courage for the rest of his life.

### D. Victor and His Wife



In the spring of 1988 towards the end of Victor's junior year at Del Valle High School, Victor met a young lady by the name of Claudia Lopez. Claudia was new to the school and Victor immediately took notice of her. He quickly inquired about her, but none of his friends seemed to know her. To Victor, Claudia seemed different from anyone he had ever met. You could say it was love at first sight, because Victor could not stop thinking about Claudia – the girl in the red glasses. To this date, Victor has kept that pair of red glasses as a symbol of their love, and the love he has felt for her since he first laid eyes on her.

After the Spring Dance Recital at Del Valle, it was common for all students to celebrate and get together at the local pizza parlor. It would be the perfect opportunity for Victor to meet Claudia as he knew that she would be attending. Victor was standing behind Claudia in line to order food when Claudia surprisingly turned around and introduced herself. This was a pleasant surprise as it spared Victor the agony of putting those first few words together. Claudia had been made aware weeks earlier of Victor's interest in her. It seems she too had noticed Victor and was looking forward to meeting him. Victor and Claudia sat and talked at the pizza parlor. They soon realized that they had many things in common and shared the same interests. They were both first generation Mexican-Americans, both spoke English and Spanish fluently and both came

14

from very close-knit Catholic families. They enjoyed a wide repertoire of music, considered themselves movie buffs and had dreams of traveling the world.



Victor and Claudia began to date and continued to see each other during that summer. The following school year, Victor was a senior at Del Valle and Claudia was a senior as well, but at a different high school. Her family had moved so she was assigned to attend a high school close to her new home. Nevertheless, these high school sweethearts kept their relationship going and both applied and prepared to attend UTEP. As planned, they both graduated high school and both began their college years. Unfortunately, the change of pace, long study hours and college trends were too much for them and their relationship ended. In 1992, both agreed to end their relationship amicably.

It was hard for them to stay away from each other as they shared the same circle of friends. It did not help that Victor's sister, Nena, had also formed a close friendship with Claudia. Nena and their mutual friends knew that Victor and Claudia were meant to be together. Sure enough, two years later, Victor and Claudia reunited and promised to never break up again.





As they both worked hard to finish up college and secure jobs, their relationship and love only grew stronger. In February 1998, Victor proposed to Claudia over a candle-lit dinner. Victor displayed his romantic side when he hired a violinist to play his favorite song, *Kissing a Fool*, by George Michael. Victor sang the words to the song as Claudia sipped on her champagne. Little did she know that Victor had placed a ring inside the flute! Upon discovering the ring, Claudia immediately said yes and the whole restaurant cheered. Victor has always been very traditional and formal. He expects open communication and transparency in all aspects of his life. It was very important for him to ask for Claudia's hand in marriage. Therefore, a dinner was planned wherein the Lopez family hosted the Avila family and all toasted to the future of the young couple.



On October 3, 1998, ten years after meeting his soul mate, Victor married his high school sweet heart at Saint Pius Catholic Church in El Paso, Texas. The bride was exquisite and the handsome groom was the happiest man on earth! The spectacular wedding accommodated 400 guests.



15

Once married, they settled into their new home in El Paso, Texas. Both had purchased their first new house shortly before the wedding. Claudia worked as an investigator for Child Protective Services. The position was very demanding and time-consuming, but her passion for protecting innocent and defenseless children inspired her to remain in social work and volunteer in several local charities, food banks and social outreach services. Victor was employed as a District Parole Officer with the Department of Criminal Justice. This would lay the foundation for his law enforcement career.

Victor and Claudia were enjoying their lives as newlyweds. They had many friends and you would often find Victor grilling outside on a Sunday afternoon hosting for their family and friends. Victor and Claudia are big sports fans and especially enjoy watching football, soccer, basketball, tennis and boxing.

In 1999, Victor applied for a position as a United States Probation Officer. Victor and Claudia had only been married a few months and if accepted, it would require for Victor to relocate to San Antonio, Texas. Victor and Claudia were ready for the change and made the move in September 1999 when Victor was notified of his acceptance. Claudia was able to transfer as an investigator with CPS in San Antonio. Just as they settled into their new home and Victor began his career as a United  States Probation Officer, they were hit with a pleasant but unexpected surprise. They were expecting their first child.

### E. Victor and His Children

#### 1. Sofia Avila

 Although Victor and Claudia enjoyed San Antonio very much, their stay there was not long. Once Victor began his new job in San Antonio he quickly learned all about the complex sentencing guidelines and the process of the U.S. Court System. Victor's supervisors quickly acknowledged his aptitude and strive for achievement. Chief Ruby Lehrman and Federal Judge Hipolito "Hippo" Frank Garcia recognized Victor's hard work and dedication in several sentencing guidelines hearings and publicly commended his work ethic.

Victor had been working in San Antonio when he was approached by Chief Lehrman whom offered him the opportunity to relocate back to El Paso. Even though Victor and Claudia fell in love with San Antonio, they quickly agreed that El Paso would always be home and soon began plans to move back to their hometown before their daughter's birth.

16

Sofia Avila was born on June 16, 2000 at 5:01 p.m. weighing an astounding 9 lbs. 14 oz. and measuring 19 inches. Unfortunately, Claudia suffered a 4th degree laceration and required surgery immediately after delivery. Victor describes Sofia as looking like a 4 month old baby when she was just a newborn! She was a burly baby and none of the newborn clothes fit her. On that day, Sofia was the only female born at Providence Memorial Hospital among 9 male babies. She was also the biggest baby!

 The joy of being new parents was evident when you saw Victor and Claudia with Sofia. They were extremely happy to be back in El Paso and felt blessed to be surrounded by their families and so much love. Sofia was the first grandchild in the Lopez family and the fourth grandchild in the Avila family.

Sofia was a happy baby with a strong will and beautiful smile. At six months, she held a spoon and wanted to feed herself. By eleven months, she no longer was bottle-fed and on her first birthday, she began to walk. At age three, she was enrolled in a  Montessori School where by the following year; she was reading her first book.

There is no denying that Sofia and her father share a very strong bond. Since her birth, Sofia has been and will always be Daddy's little girl. As a baby, she would fall  asleep on his chest and cry if she was removed and carried to her crib. When she started to walk, it was towards Victor that she fastened her pace. Throughout the years, the bond between Sofia and her father has only grown stronger. Today, Sofia is a caring, outgoing young teenager who loves to laugh and make new meaningful friendships. She is an honor student who is an avid reader. She has a passion for United States history especially the Civil War and Abraham Lincoln. She shares her father's passion for music and travel. To Sofia, there is no greater hero or role model on earth than her father.

### 2.   Victor Emilio Avila

Throughout Victor's career with US Probation, he worked closely with other federal, state and local law enforcement agencies. After the attacks on September 11,  2001, a new agency was formed to fight terrorism. Despite Victor's accomplishments with U.S. Probation, he felt the need to become involved in the War on Terror given that he lived in a border town. To Victor, it was a calling to serve his country the best way he knew how. So he applied to join the U.S. Immigration and Customs Enforcement (ICE) and waited.

In early 2004, Victor and Claudia were thrilled once more with the news of another baby. When they explained to Sofia that there would be an addition to the family, she immediately remarked, "I want a baby brother." To everyone's delight, it was determined that Claudia would be having a baby boy.

It was a few months into the pregnancy that Victor was accepted to join ICE and he was to attend training at the academy in Glynco, Georgia. The academy was 22 weeks  long and would start in late August 2004. As happy as they were to receive the news, it would also mean that Victor would not be present for his son's birth. This was devastating for Victor as he knew that Claudia's pregnancy had been categorized as a high-risk pregnancy due to symptoms of preeclampsia. Claudia was scheduled to undergo cesarean section surgery on September 16, 2004. It was not an option as Victor knew that if he wanted to be a federal agent with the Department of Homeland Security, he had to attend the academy in August. It was with a heavy heart and Claudia's blessing that Victor drove to Georgia to commence his training as an ICE Agent.

On Thursday, September 16, 2004, at 10:30 a.m. Victor Emilio Avila was born at Providence Memorial Hospital. Victor Emilio was a healthy baby boy weighing 7 lbs. 8 oz. and measuring 20 inches in length. He was born with an angelic face and a tight grip.  Despite the joy, it was bittersweet since Victor was not present. Unable to be present for his son's birth, Victor made arrangements to take an exam early in the morning and booked the next flight out of Jacksonville, Florida to El Paso. He would meet his son the evening of September 17, 2004 then fly back to complete his training 2 days later. That day, upon Victor's departure he held his tiny son in his arms and told him he would return soon and promised to always be there for him no matter what the circumstances.

Finally, on January 28, 2005 the family along with Victor's parents traveled to  Glynco, Georgia to witness Victor's graduation from the ICE Academy. Everyone was so proud of Victor. Victor had finally reached his dream of becoming an ICE Agent.

Victor Emilio is a kindhearted child, noble and amazingly giving. Nothing is complicated about Victor Emilio. As a toddler, he would pick flowers from neighboring gardens and give them to his mother. There is a transparency in how he views the world, a quality which no doubt comes from his father. He appreciates direction and instruction and follows it with fervor. He is a thoughtful, playful child with incredible insight who likes to ask hypothetical questions. He loves to

18

play with Legos and enjoys music, especially if it is Michael Jackson.

Victor Emilio's teachers have described him as a perfectionist. One who takes his time to finish his tasks and is always eager to learn. He is gifted in mathematics and has excellent penmanship. Everyone who meets Victor Emilio is delighted by his genuine sincerity; an undisputed Avila trait.

### F. Victor's Career with I.C.E.

In 2005, Victor began his career with ICE and was assigned to a narcotics conspiracy investigations group. Two and a half years later, Victor joined the human smuggling/trafficking investigative unit. Victor became the point of contact for SAC El Paso and was the ICE representative for the Human Trafficking Task Force. Victor valued the importance of reaching out to the community and was therefore active in giving presentations and bringing awareness to all schools and universities in El Paso, Texas and Las Cruces, New Mexico.





By this time, Claudia had made a career change and no longer worked for CPS. In 2006 she accepted a position with Novo Nordisk Pharmaceuticals and continued her career as a sales representative. Claudia and her sales team were very successful which earned them the Circle of Excellence award. This was a top honor within the company. For her hard work, she was rewarded with a trip to Monaco and Italy wherein all expenses were paid for her and Victor! She was then promoted to Senior Diabetes Specialist.



Victor continued to grow as a Special Agent with ICE. He took pride in his job and was very dedicated. He often worked long hours, but that did not bother him as he enjoyed his job very much. He felt good knowing that he was getting the "bad guys."

During his time as a Senior Special Agent in El Paso, Victor was recognized on several occasions for his outstanding investigative skills. He conducted numerous arrests for possession and







distribution of drugs, especially those linked to smuggling through the border. Victor was key to detaining and ending an alien smuggling organization which involved a corrupt U.S. Border Patrol Agent. Victor successfully exploited all available investigative tools to gather incriminating, as well as exculpatory, evidence regarding all identified targets. Victor was recognized for his use of confidential sources and electronic surveillance equipment in gathering high quality evidence. In another case, Victor's involvement was critical in capturing alien smugglers that had separated an 18 month old toddler from her mother in order to facilitate their smuggling into the U.S.

In October 2008, Victor applied for a 60-day Temporary Duty (TDY) with the ICE Office of International Affairs (OIA) at the US Consulate in Ciudad Juarez. Victor knew this was his opportunity to broaden his investigative skills and experience by expanding ICE's mission in Mexico. However, he also knew the danger it posed. Victor was welcomed as part of the OIA group and he made the difficult decision of not telling his parents about this TDY. He worked non-stop for 10 weeks. His long hours, his work ethic and his dedication paid off and in December he was invited to work in Mexico City as part of his TDY.

Victor quickly embraced Mexico City. It was clear to him that he would love the opportunity to work and reside in Mexico City. It was a fast paced environment wherein he worked long hours. His hard work paid off and his TDY was extended. A few weeks later, Victor along with several other ICE Agents, was escorting a fellow agent out of Mexico. The convoy stopped and Victor spoke with Attaché Garcia who offered Victor a permanent position with the Mexico City Attaché Office. Victor accepted the position and sealed his fate. Victor and his family arrived for their three year stay in Mexico City on June 20, 2009.



Victor most recently received the Director's Award for outstanding human smuggling investigation from Phoenix, Arizona. He was nominated for his work in Operation Plain Sight which took place in 2010. This was a human smuggling case which took down at least 60 smugglers in Arizona. This was a complex operation involving Mexico and the U.S. As the case agent, Victor worked the operation in Mexico and again proved what type of agent he was by showing his quality of work and his dedication. The main smuggler plus four others were arrested in Mexico. His attention to detail has earned him recognition from different levels of government. Perhaps these are the qualities that helped him to survive the attack of February 15, 2011.

20

## V.    THE AGENCIES LIABILITY

### A. Federal Tort Claims Act

The Federal Tort Claims Act ("FTCA") grants jurisdiction for actions on monetary claims for injury, property loss or death caused by the negligent or wrongful act or omission of any employee of the Government. 28 U.S.C. § 1346(b). The United States may be held liable under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. *Id.* The duty of the United States in a tort action is defined in accordance with the law of the state where the negligence occurred. *Richards v. United States*, 369 U.S. 1 (1962).

### B. Negligence

In Texas, the elements for a negligent cause of action are as follows: 1) the defendant owed a duty to the plaintiff; 2) the defendant breached the duty; and 3) the breach proximately caused the plaintiff's injuries. *See Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401 (Tex. 2009).

#### a. Duty

In determining whether a duty exists, courts may apply the risk-utility test. The factors the courts use when applying the risk-utility test are the risk, foreseeability, and likelihood of injury balanced against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant. *Id.* at 405. When these factors are balanced, the most important factor to consider is the foreseeability of the risk. *City of Waco v. Kirwan* 298 S.W.3d 618, 624 (Tex. 2009). Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable. *Mellon Mortg. Co. v. Holder*, 5 S.W.3d 654, 655 (Tex. 1999). Other factors the court may consider are whether one party had superior knowledge of the risk; whether the party had a duty to control the conduct of the person who caused the injury; statutory duties; and whether a special relationship exists.

#### b. Breach

Avila's injuries and Zapata's death were caused as a direct result of the actions of the Agencies referenced above. Specifically, but not exclusively, the Agencies owed a duty to Zapata and Avila and breached those duties as follows: (1) use ordinary care in providing a reasonably safe workplace [improper supervision and orders; improperly inspected and unsafe vehicle; lack of relevant knowledge concerning gun walking's reaches]; (2) use ordinary care in establishing rules and regulations for an employee's safety [failure to abide by policies regarding roads to be traveled and violation of arms export regulations in addition to failing to use a

21

shipping service which was ordinarily used for such purposes]; (3) use ordinary care in warning employees of the hazards of employment that are not commonly known or appreciated by employees [failure to inform agents that are potentially in danger that arms are effectively being provided to the cartel and other criminal organizations by the US]; (4) use ordinary care in furnishing reasonably safe machinery [grossly flawed vehicle]; (5) use ordinary care in supervising an employee's activities [gun walking]; (6) use reasonable care to prevent an employee from actuating an unreasonable risk of harm to others [gun walking and supervisors instructing the agents to drive down a personnel restricted and recognizably dangerous road]; (7) prevent injury to others if it reasonably appears or should appear that in the exercise of their lawful rights others may be injured by a dangerous condition that was created by the individual [gun walking]; (8) exercise reasonable care to avoid a foreseeable risk of injury to others [gun walking and driving, unescorted, in a flawed and vulnerable vehicle, down a recognizably dangerous road]; (9) take affirmative action to control or avoid increasing the danger from a condition that has been at least partially created by the defendant's conduct [gun walking and lack of full disclosure]; (10) use ordinary care in aiding or protecting others from peril when the peril is under the individual's control [gun walking]; (11) use ordinary care in not placing others in harm's way of foreseeable criminal activity [gun walking, road with imminent danger, and highly vulnerable and conspicuous vehicle].

### c. *Causation*

To prove an action for negligence, the plaintiff must establish the defendant's breach of duty proximately caused the plaintiff's injury. *Nabors*, 288 S.W.3d at 404. The components of proximate cause are (1) cause-in-fact and (2) foreseeability. The test for cause-in-fact, or "but-for" causation, is whether the negligent act or omission was a substantial factor in bringing about injury and whether the injury would have occurred without the act or omission. *Del Lago Partners v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010).

As discussed above, the Agencies had or should have had intimate knowledge of the actions of Julian Zapata Espinoza aka "Piolin"; the Osorio Brothers; and Manuel Barba among others. The negligent acts exhibited by the Agencies in allowing the above individuals to perpetuate the crimes constituted the first chain of events that caused the injuries sustained by Victor Avila, Jr. and the subsequent and continuing injuries he continues to sustain. The Agencies should have anticipated the danger they created by their overt acts and omissions in allowing weapons to be placed in the hands of the very people our Agents target and are in a continuing battle to suppress and eradicate. The Agencies knew that these added munitions being supplied to the Zetas cartel and others would substantially impact and increase the dangers posed to their agents. Moreover, the above listed series of acts and omissions by the Agencies completely exacerbated the situation and posed imminent threat to Avila and Zapata, all of which the Agencies owed a duty to prevent and to act in a manner consistent with reasonable and prudent law enforcement activities and procedures.

22

The acts and omissions by the Agencies proximately caused the injuries claimed herein and are a direct result of the Agencies misconduct.

## C. Intentional Infliction of Emotional Distress

Peace of mind is a personal interest of sufficient importance to receive the law's protection against intentional invasion by outrageous conduct. *Eckenrode v. Life of America Insurance Company*, 470 F.2d 1, 4 (7th Cir. 1972). The agencies placed the weapons in the hands of the Zetas cartel and failed to warn, thereby, the Agencies themselves placed Avila and Zapata in harm's way. The Agencies' conduct contributed to, increased, and changed the risk which would have otherwise not existed. The conduct of the Agencies was so extreme as to exceed all bounds of that usually tolerated in a civilized community. The Agencies' conduct was done so in a reckless disregard for the safety of others and failed to act and perform their duties. The Agencies knew that the conduct would create an unreasonable risk of harm to others. The risk imposed is far greater than that conduct that would simply be considered negligent. Liability has been found where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous." *See Barnes v. Double Seal Glass Co. Inc., Plant 1*, 129 Mich. App. 66, 341 N.W.2d 812, 817 (1983).

The Agencies' actions did not cease at the point of allowing our Agents to be put in harm's way and continue each and every day until the actions, taken as a whole, are put to an end and the Agencies rectify the wrongs they caused and continue to cause. The Agencies ongoing refusal to answer Avila's and the Zapata Family's concerns and questions regarding the attack, the firearms allowed to enter into Mexico, and the United States' involvement represents a continuing violation of common law and common sense. The concerted acts of the Agencies is a continuing violation of the rights of Avila and Zapata and the violation has not and will not cease until the final act in furtherance of the concerted actions cease. The continuing violation at issue here aggregates multiple wrongful acts, failures, and decisions such that the collected malfeasance continues until the Agencies cease their improper conduct. Here, no single incident in this continuous chain of tortious activity can fairly or realistically be identified as the cause of the significant harm, such that Avila's and the Zapata Family's causes of action arise not from individually identifiable wrongs, but rather from a series of acts collectively considered. When the acts and conduct are continuous, as they are in this case, and done by the same actor, of the same nature, and the conduct is tortious and actionable as continuous, cumulative, synergistic in nature, then the conduct is actionable until the last act occurs or the actions are abated. Limiting the claims to preclude the "cover-up" would render the claim unintelligible and nugatory, for the injuries inflicted upon Avila and the Zapata Family could only be understood and evaluated by reference to all the activity, including the subsequent cover-up. The unwillingness or

23

misapplication of the continuing violation doctrine would effectively give the Agencies a license to perpetuate its misconduct.



24

In a letter to Attorney General Holder, Congressman Issa expressed his concerns with the distorted truth and the continued deception towards the Government's involvement with gun walking and is a clear example of the "outrageous" conduct being exhibited by the Agencies.

Since the Department initially misrepresented the facts and misled Congress, it is necessary to investigate the Department's response to our investigation. Your actions lead us to conclude that the Department is actively engaged in a cover-up. It is essential for the Department's Office of Legislative Affairs to facilitate the production of documents we have requested so we can complete our investigation. The Department's persistent delay tactics make this task increasingly and unreasonably difficult.

In short, the Committee requires full compliance with all aspects of the subpoena, including complete production of documents created after the Department's February 4, 2011 letter. As such, provide all documents pursuant to the October 12, 2011 subpoena as soon as possible, but by no later than 5:00 p.m. on February 9, 2012. Should you choose to continue to withhold documents pursuant to the subpoena, you must create a detailed privilege log explaining why the Department is refusing to produce each document. If the Department continues to obstruct the congressional inquiry by not providing documents and information, this Committee will have no alternative but to move forward with proceedings to hold you in contempt of Congress.

Sincerely,

Darrell Issa
Chairman

"The courts have unanimously held that a cause of action sounding in tort arises in the jurisdiction where the *last act* necessary to establish liability occurred." *Sosa v. Alvarez-Marchain*, 542 U.S. 692, 705 (2004) (emphasis added). The continuing violation doctrine tolls the limitations of an action until the last act occurs. The facts above clearly indicate the continuing cover-up and tortious acts by the Agencies and the continuing failure to rectify any of the Agencies malfeasances are occurring and continue to occur here in the United States.

25

By way of example, Avila and the Zapata Family have been kept in the dark in regards to many issues and circumstances surrounding the incident. Questions have been posed without adequate answers on issues such as:

1. What written policies and protocols were in force in Mexico and disregarded?

2. What policies prohibit, if any, ICE agents from carrying weapons to protect themselves while working in Mexico?

3. What protocols are in place to protect ICE agents if no weapons are allowed, such as armed escorts?

4. Has there been or will there be any attempt to reconstruct what the sequence of events were that lead to the murder of Jaime Zapata and the attack on Victor Avila, Jr.?

5. What information, by way of photographs, statements, videos, or other documentary and tangible evidence has been obtained and what reasons have prevented the Government from disclosing the information?

6. What are the details of the vehicle the agents were driving and has it been inspected or were there concerns regarding the safety of the vehicle?

7. What was the specific purpose of the mission Jaime Zapata and Victor Avila, Jr. were sent on at the time of Zapata's murder and why was the mission so urgent despite knowledge of the dangers it posed?

8. Why were Jaime Zapata and Victor Avila, Jr. required to drive, unescorted, across a highway that was known to be dangerous while D-Pouch available?

9. What concrete steps are being taken to ensure that another senseless tragedy like this cannot happen again?

10. How many weapons have been recovered that are directly attributable to gun walking?

11. What manner of surveillance were the Agencies conducting on the gun walking activities?

12. Why are the Agencies avoiding responsibility for gun walking?

13. Who authorized the gun walking? Where is he/she now?

14. Are Mr. and Mrs. Zapata's other sons, active federal agents, in danger due to the outstanding issues that have yet to be resolved?

The Agencies' conduct described above is a proximate cause of Victor Avila Jr.'s and his family's emotional distress. The intended consequence of the Agencies conduct is emotional distress on Victor Avila, Jr. and the Avila family. There is no reasonable explanation, nor have the Agencies attempted to clarify, rectify, or for that matter, take responsibility for their inept actions that resulted in the death of Jaime Zapata and the injuries to

26

Victor Avila, Jr. As such, Victor Avila, Jr. asserts his grievances and causes of action against the United States Government pursuant to the Federal Tort Claims Act and applicable law. As a direct result of the Agencies' failures, Victor Avila, Jr. is, and will continue to suffer severe emotional distress, mental anguish, and strain directly relating to his unanswered questions and the seemingly betrayal he has undergone by the government he swore to protect. Said damages are a direct consequence of the Agencies' unwillingness to display sympathy; to cooperate with Victor's need for answers; a complete lack of remorse; and their continued unabashed manner in which they have held themselves surrounding the incident.

### D. Demand for Damages

Victor Avila, Jr. seeks damages in the sum certain amount of $12,500,000.00 as authorized by the Federal Tort Claims Act and as allowable by law to settle all of his claims against the Agencies. The damages that Victor has undergone have been severe and exacerbated by the Agencies continued conduct. The simple truth is that these damages could have been avoided by the Agencies alone.

Victor Avila, Jr. reserves the right to amend this demand as additional information is developed and the passage of time better informs him as to the scope of his damages.

## VI.  CONCLUSION

Victor Avila Jr.'s injuries could have and should have been prevented. The acts and claims discussed above occurred as a direct result of the Agencies' egregious conduct. The Agencies cannot hide behind a cloud of bureaucracy in order to avoid taking responsibility for their actions.

Should you have any additional questions or require additional information, please do not hesitate to contact us.

Sincerely,

**Martinez, Barrera & Martinez, LLP**

Benigno "Trey" Martinez

**KITTLEMAN, THOMAS & GONZALES, LLP**

Raymond L. Thomas

**Rad Law Firm, PC**

Magdalena A. Villalobos

27

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any, (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| United States Bureau of Alcohol, Tobacco, Firearms & Explosives, U.S. Immigration and Customs Enforcement, and Federal Bureau of Investigation | Victor Avila, Jr. c/o Martinez, Barrera & Martinez, L.L.P. 1201 E. Van Buren Brownsville, TX 78520 |

| 3. TYPE OF EMPLOYMENT ☐ MILITARY ☒ CIVILIAN | 4. DATE OF BIRTH | 5. MARITAL STATUS Married | 6. DATE AND DAY OF ACCIDENT 02/15/2011    Tuesday | 7. TIME (A.M. OR P.M.) Afternoon |
|---|---|---|---|---|

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

Victor Avila was shot and severely wounded by criminals in Mexico that obtained murder weapons through straw buyers in Texas all while under the surveillance of ATF and with the knowledge of ICE and the FBI. ICE, with complete disregard for policies and directives, instructed Agents Zapata and Avila to drive down a known Zetas controlled area in a flawed and conspicuous SUV while not escorted and D-Pouch available, among other negligent acts discussed in the attached document. The negligent acts of the agencies also include a cover up and intentional failure to inform Avila of the surrounding facts.

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

None

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

None

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

"Los Zetas" gunmen in two vehicles trapped the flawed SUV Victor Avila was driving in. Upon placing the SUV in park, the doors automatically unlocked, the gunmen opened a door, the passenger window was lowered in the struggle to close and lock the door, and the gunmen used the trafficked weapons to shoot and severely injure Avila. ATF, ICE, and FBI then covered up their participation in allowing these weapons to be used by the Zetas and concealed the facts concerning the Mexico incident.

| 11. | WITNESSES |
|---|---|
| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
| Victor Avila | 12900 Preston Road #900  Dallas, TX 75230 |
| Anthony Salisbury | c/o Department of Justice |
| Agents of ATF, ICE, and FBI | c/o Department of Justice |

| 12. (See Instructions on reverse). | AMOUNT OF CLAIM (in dollars) | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
| 0.00 | 0.00 | 12,500,000 | 12,500,000 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM 956-546-7159 | 14. DATE OF SIGNATURE 06/08/2012 |
|---|---|---|
| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS | |
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) | |

Authorized for Local Reproduction
Previous Edition is not Usable
95-109

NSN 7540-00-634-4046

STANDARD FORM 95 (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

| INSURANCE COVERAGE |
|---|

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

15. Do you carry accident insurance? [ ] Yes    If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number. [ ] No

N/A

| 16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible? [ ] Yes [ ] No | 17. If deductible, state amount. |
|---|---|
| N/A | 0.00 |

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts).

N/A

19. Do you carry public liability and property damage insurance? [ ] Yes    If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code). [ ] No

N/A

| INSTRUCTIONS |
|---|

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.**

Complete all items - Insert the word NONE where applicable.

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A SUM CERTAIN FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN TWO YEARS AFTER THE CLAIM ACCRUES.

Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

If instruction is needed in completing this form, the agency listed in Item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filled by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

(b) In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d) Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

| PRIVACY ACT NOTICE |
|---|

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
   A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

| PAPERWORK REDUCTION ACT NOTICE |
|---|

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC 20530 or to the Office of Management and Budget. Do not mail completed form(s) to those addresses.

STANDARD FORM 95 REV. (2/2007) BACK

## **CONSENT TO FEE-SHARING AND JOINT REPRESENTATION AGREEMENT**

Victor Avila, Jr. ("Client") does hereby acknowledge and consent to the following Fee Sharing and Joint Representation Agreement in relation to the cause regarding Victor Avila, Jr. arising out the incident which occurred on February 15, 2011. This Agreement will continue to be in full force and effect if and when a lawsuit is filed.

1. Client has previously executed a Contingent Fee Agreement with the law firm of Rad Law Firm; P.C. ("RLF") dated November 9, 2011. That agreement remains in full force and effect. All attorneys' fees referenced herein will be calculated pursuant to the terms of the RLF Contingent Fee Agreement. Client's attorneys' fees will not increase as a result of the instant agreement.

2. Pursuant to the terms of the Contingent Fee Agreement, RLF now desires to hire and associate Raymond Thomas, Kittleman, Mr. Thomas & Gonzalez, LLP, 4900-B North 10th Street, McAllen, Texas 78505 ("THOMAS") and Mr. Benigno (Trey) Martinez, Martinez, Barrera and Martinez, L.L.P., 1201 East Van Buren, Brownsville, Texas 78520 ("MARTINEZ") (hereinafter referred jointly as THOMAS/MARTINEZ) to jointly represent the interests of the Client in the Lawsuit.

3. RLF and THOMAS/MARTINEZ will share, as outlined below, any attorneys' fees realized by way of judgment and/or settlement in the Lawsuit.

4. In the event that the Lawsuit is settled prior to the commencement of jury selection, THOMAS/MARTINEZ and RLF will equally split any attorneys' fees on Victor's claims, each firm to take 1/3 of the fees.

5. In the event that attorneys' fees are realized after the commencement of jury selection, either via settlement or judgment, THOMAS/MARTINEZ and RLF will equally split any attorneys' fees on Victor's claims, each firm to take 1/3 of the fees.

6. THOMAS/MARTINEZ will bear expenses for pursuing the case and will bear the responsibility for hiring and paying for any applicable experts in pursuing the matter. RLF will cover its own expenses both in the past and in the future.

7. THOMAS/MARTINEZ and RLF assume joint responsibility for the representation of the Client.

8. Client does hereby indicate his understanding of the terms of this agreement and expressly consents to its terms.

Signed this 5th day of April, 2012.

Client — Victor Avila Jr.

Raymond L. Thomas
Kittleman, Thomas & Gonzalez, LLP
4900-B North 10th Street
McAllen, Texas 78505
(956) 686-8797
(956) 630-5199 FAX

Trey Martinez
Martinez, Barrera & Martinez, L.L.P.
1201 East Van Buren
Brownsville, Texas 78520
(956) 546-7159
(956) 544-0602 FAX

Magdalena Villalobos, RLF

U.S. Department of Justice                          Significant Information Report
Bureau of Alcohol, Tobacco, Firearms and Explosives

DATE: 02/28/2011
FROM: Dallas Field Division
FIELD OFFICE: Dallas III (Firearms Trafficking) Field Office

## CASE INFORMATION

CASE NUMBER: 781015-11-0009

CASE TITLE: Laredo Zetas

| SPECIAL AGENT: | TELEPHONE NUMBER: |
|---|---|
| Tarango, Hector | (469)227-4408 |

### SYNOPSIS OF INCIDENT/ACTIVITY

Execution of Federal Search and Arrest Warrant(s) for Ranferi and Otilio Osorio.

### NARRATIVE OF INCIDENT/ACTIVITY

On February 28, 2011, SRT Team 3 and Dallas Group III executed a federal search warrant at the residence of Ranferi and Otilio Osorio in Lancaster, TX. A federal warrant for arrest was also executed for violations of 18 USC 922(K), possession of firearms with obliterated serial numbers. Both suspects were arrested without incident.

Evidence located at the residence were multiple firearms, ammunition, documents, and indicia of firearms trafficking. The grinding wheel, sander, and black spray paint were also recovered in the rear work area where the suspects were obliterating the serial numbers.

These warrants were the culmination of intense investigative activity conducted after trace information was received indicating a firearm purchased in the Dallas area was used in the shooting and subsequent death of ICE Special Agent Jaime Zapata. Specifically, three (3) firearms with obliterated serial numbers were recovered by Mexican authorities. The serial numbers were raised and the firearms were subsequently traced. Of the three, one firearm was traced directly to Otilio Osorio. Ballistic testing further confirmed the firearm was used in the murder of SA Zapata.

This investigation continues in conjunction with the FBI, ICE, and Texas DPS.

Otilio and Ranferi Osorio were taken before U.S. Magistrate Judge Paul D. Stickney, Northern District of Texas and were ordered detained pursuant detention hearings later in the week.