UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| Mary M. Zapata, Individually and as Administrator of the Estate of Jaime J. Zapata, Amador Zapata, Jr., and Victor Avila, Jr. | § § § § | |
| v. | § § | |
| The United States of America; Manuel Barba; Otilio Osorio; Ranferi Osorio; Kelvin Morrison; Blandon Derrick Shaffer; Robert Riendfliesh; JJ's Pawn Shop, Inc.;  Unknown FFL Dealer; BAE Systems, Inc.; O'Gara-Hess & Eisenhardt Armoring Company, L.L.C.;Unknown Vehicle Manufacturer/Outfitter; Department of Justice; Department of Homeland Security; and John and Jane Doe(s) | § § § § § § § § § § § § | Civil Action No.1:13-cv-00022 |

## PLAINTIFFS' FIFTH AMENDED COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

NOW COME Mary M. Zapata, Individually and as Administrator of the Estate of Jaime J. Zapata, Amador Zapata, Jr. and Victor Avila, Jr., Plaintiffs, and file this Fourth Amended Complaint complaining of Defendants: Manuel Barba; Otilio Osorio; Ranferi Osorio; Kelvin Morrison; Blandon Derrick Shaffer; Robert Riendfliesh; JJ's Pawn Shop, Inc.; Unknown federally licensed firearms dealers; BAE Systems, Inc.; O'Gara-Hess & Eisenhardt Armoring Company, L.L.C.; Unknown Vehicle Manufacturer/Outfitters; The United States of America; Department of Justice; Department of Homeland Security; and the John and/or Jane Doe(s) straw purchasers not yet identified[1] and would respectfully show the Court as follows:

---

[1] Note that the list of defendants has been altered to reflect the dismissal of Defendant Off-Duty Enterprises Inc. and the Individual Federal Defendants.  As the Court is aware, Plaintiffs have settled with JJ's Pawn Shop, Inc. and will be filing appropriate papers to dismiss this Defendant.

## I.    PARTIES

1.    Mary M. Zapata is a Plaintiff both in her individual capacity and as Administrator of the Estate of Jaime J. Zapata.  Mrs. Zapata permanently resides in Brownsville, Cameron County, Texas.

2.    Plaintiff Amador Zapata, Jr. is an individual who permanently resides in Brownsville, Cameron County, Texas.

3.    Plaintiff Victor Avila, Jr. is an individual who resides in the United States.

4.    Defendant Manuel Barba is an individual and federal prisoner who resides in Houston, Harris County, Texas.

5.    Defendant Otilio Osorio is an individual and federal prisoner who resides in Seagoville, Dallas County, Texas.

6.    Defendant Ranferi Osorio is an individual and federal prisoner who resides in Texarkana, Bowie County, Texas.

7.    Defendant Kelvin Morrison is an individual and federal prisoner who resides in Beaumont, Jefferson County, Texas.

8.

9.    Shaffer is an individual who resides in Baytown, Harris County, Texas.

10.    Defendant Robert Riendfliesh is an individual who resides in Dayton, Liberty County, Texas.

11.    Defendant JJ's Pawn Shop, Inc. is a Texas corporation that is located in Beaumont, Jefferson County, Texas.

12.     Defendant Unknown FFL Dealer is a fictitiously named defendant whose identity is presently unknown to Plaintiffs.  Plaintiffs will seek leave to amend this compliant when such Unknown FFL Dealer becomes known.

13.     O'Gara-Hess & Eisenhardt Armoring Company, L.L.C. (hereinafter "O'Gara") purchased the armoring division of BAE Systems, Inc.

14.     Defendant Unknown Vehicle Manufacturer/Outfitter is a fictitiously named defendant whose identity is presently unknown to Plaintiffs.  Plaintiffs will seek leave to amend this complaint when Unknown Vehicle Manufacturer/Outfitter becomes known.

15.     Defendant Department of Justice is an agency of the United States of America. Defendant Department of Homeland Security is an agency of the United States of America.

16.     Defendants John and/or Jane Doe(s) are fictitiously named defendants whose identities are presently unknown to Plaintiffs.  Plaintiffs will seek leave to amend this complaint when John and/or Jane Doe(s)'s true name(s) become known.

## II.     JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

17.     This Court has jurisdiction over Plaintiffs' FTCA claims pursuant to U.S.C. Const. art. III, § 2, cl. 1, 28 U.S.C. § 1331, and 28 U.S.C. § 1346(b)(1).  The Court has jurisdiction over Plaintiffs' FOIA action under 5 U.S.C. § 552(a)(4)(B).  The Court has jurisdiction over Plaintiffs' remaining claims under 28 U.S.C. § 1367.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3) and (e)(1).

19.     Pursuant to 28 U.S.C. § 2675(a) the claim set forth herein was presented to the Federal Bureau of Investigation ("FBI"), the Bureau of Alcohol, Tobacco, and Firearms

("ATF"), and the U.S. Immigration and Customs Enforcement ("ICE") on or about June 14, 2012.

20. ICE was designated as the lead agency to adjudicate the claims and was authorized by the FBI and ATF to adjudicate the tort claims made against those agencies as well. On or about January 7, 2013, ICE denied all tort claims made by Plaintiffs against ICE, FBI, and ATF.

21. All conditions precedent to a Federal Tort Claims Act have been met.

## III. FACTUAL BACKGROUND

### A. *The United States Knowingly Allowed Guns to Walk into Cartels' Hands*

22. For years, dangerous drug cartels in Mexico have been acquiring firearms such as AK-47 variants, M-16 variants, and 50-caliber sniper rifles through whatever sources are available, including through gun dealers in the United States. Cartels use these firearms in cartel wars, against Mexican and U.S. officials and agents, and in the killing of innocent civilians, both Mexicans and Americans.

23. One common avenue for the cartels to acquire weapons from the United States is to use a straw purchaser—i.e., a person who can purchase the firearm from the gun dealer, who will then transfer the firearm(s) to persons that will smuggle the firearms into Mexico.

24. With knowledge that the Mexican drug cartels often use straw purchasers in the United States, the ATF, specifically the Phoenix field office of the ATF, implemented a program called "Fast and Furious." As part of Fast and Furious, the Phoenix office identified 43 persons in the Phoenix area that it suspected of being straw purchasers linked to the smuggling of firearms into Mexico and into the hands of the Mexican drug cartels. The ATF agents in the

Phoenix office visited most of the local gun dealers and instructed the gun dealers to continue selling to the people who were on this list of suspected straw purchasers and to notify ATF of any transactions with these individuals.

25.    The Phoenix field office conducted surveillance on some of these gun dealers and on some of the individuals suspected of being straw purchasers.  The ATF observed numerous straw purchases of firearms taking place as well as the transaction following the purchase that resulted in the transfer of the firearms to persons suspected of transferring the firearms into Mexico.  However, the ATF agents were instructed not to make any arrests and not to follow the firearms after the firearms were transferred.  Instead, the ATF agents purposely allowed these illegal firearms transactions to take place and then allowed the firearms to disappear from their surveillance.  In other words, they allowed the guns to "walk."[2]  Indeed, the policy was to *not* maintain surveillance on the firearms that the ATF suspected would be transported to Mexico.  Moreover, the ATF agents were instructed not to stop the transfer and transportation of the large majority of these firearms, which the ATF agents had numerous opportunities and legal grounds to interdict.  Moreover, until a border patrol agent, Brian Terry, was murdered with one of these Fast and Furious weapons, the ATF agents were not given authority to make any arrests in connection with Fast and Furious.  In short, the ATF was allowing guns to walk that the agents knew were destined for Mexico and the hands of cartel members.

26.    Another key part of the Fast and Furious program involved preventing anyone from tracing these firearms that were allowed to walk when they turned up at crime scenes.  Once a gun dealer notified the ATF of a sale to a suspected straw purchaser, an ATF agent in the Phoenix office would input the information about that gun into the suspect gun-database.  This

---

[2] "Walking," according to former ATF SAC in Phoenix, Newell, is a common law enforcement term used to describe a situation in which "a law enforcement agency . . . actually puts some sort of evidence into the hands of a suspect in an undercover operation or an investigation and . . . then don't [sic] follow up where that is going."

was a database that only the ATF can access, and because of the security settings on Fast and Furious, only agents assigned to Fast and Furious could access information entered about these firearms. The effect of entering firearms into this database is that when a firearm is recovered and someone attempts to trace it using eTrace, the ATF case agent and his supervisor who oversaw the firearm being entered into the database are notified of the attempted trace and must authorize the trace to continue. The policy in Fast and Furious was not to permit any traces to proceed. The effect of this was that the person who recovered the firearm at a crime scene or otherwise would not obtain any trace information. Moreover, the gun dealer who sold the gun would not be notified of the eTrace on the firearm he sold, i.e., it would not know if/when a firearm sold was used in crime or was found in Mexico.

27. On information and belief, the Fast and Furious program, aka the Phoenix-model, was to be the method by which ATF field offices in the border states would all operate. Indeed, agents from other field offices, including Dallas and Houston, were flown to Phoenix in 2010 for training on this program. A number of agents who were there for training expressed concerns that this seemed to be no more than a gunwalking operation. However, any agent with too many questions was reassigned.

28. On information and belief, the Phoenix-model of Fast and Furious also spread naturally to other offices as Fast and Furious weapons and purchasers turned up in other areas. Cases based on the Phoenix model were opened in the Las Cruces, New Mexico field office as well as the El Paso and Dallas divisions. Specifically, the Las Cruces case 785096-10-0035 and the Dallas case 782080-11-0011 were parallel to the Phoenix model, i.e., the Fast and Furious program. As in Phoenix, a critical part of these cases was a policy of not maintaining

surveillance of the firearms, not making arrests, and not interdicting the weapons before they crossed into Mexico—i.e., simply allowing the guns to walk.

### B.     The Gun Dealers Knowingly Sold Firearms to Straw Purchasers

29.     An integral part of Fast and Furious (and parallel cases in other divisions) was the willingness of gun dealers, specifically Federal Firearm Licensed dealers (hereinafter "FFLs"), to knowingly sell firearms to straw purchasers.

30.     On or about May 26, 2010, Defendant JJ's Pawn illegally sold ten (10) AK-47 variant WASR-10 rifles to Defendant Blandon Derrick Shaffer, a notorious straw buyer under ATF investigation.   Subsequently, on or about August 20, 2010, Defendant JJ's Pawn illegally sold ten (10) AK-47 variant WASR-10 rifles to straw purchaser Defendant Robert Riendfliesh. JJ's Pawn noted that Riendfliesh had acquired additional firearms from their business.  JJ's Pawn knew or should have known that Shaffer and Riendfliesh were straw purchasers.

31.     Moreover, JJ's Pawn knew or should have known that Schaffer and Riendfliesh would use the firearms illegally, that these purchasers were trafficking the firearms, that the firearms were destined to be smuggled to Mexico, and/or that these straw purchasers would otherwise be using the firearms in a manner involving an unreasonable risk of physical harm to others.

32.     Indeed, these straw buyers purchased these firearms to illegally traffic them to drug cartels in Mexico.  Defendant Manuel Barba, a person prohibited from possessing firearms, directed Riendfliesh and Shaffer to buy a number of firearms from a particular FFL, JJ's Pawn.  Barba illegally exported these firearms supplied by Defendant JJ's Pawn to cartels in Mexico.

33.     Similarly, Defendant Off-Duty Armory, sold firearms to known straw purchasers. Specifically, on or about October 10, 2010, Off-Duty Armory illegally sold an AK-47 variant Draco handgun to a straw purchaser and weapons trafficker, Defendant Otilio Osorio, at a gun show in Fort Worth, Texas. At the time of the sale, Off-Duty Armory knew or should have known that Osorio would use the firearms illegally, that Osorio was trafficking the firearms, that the firearms were destined to be smuggled to Mexico, and/or that Osorio would otherwise use the firearms in a manner involving an unreasonable risk of physical harm to others.

34.     Indeed, Osorio purchased the firearm from Off-Duty Armory as a straw purchaser. Otilio Osorio, Ranferi Osorio, and Kelvin Morrison worked together to obtain and illegally export firearms, including the Draco supplied by Off-Duty Armory, to cartels in Mexico. The Osorio brothers and Morrison had been under investigation and suspected of this illegal activity dating back to the summer of 2010.

### C.     The Mexico Supervisors Sent Zapata and Avila to their Death

35.     Just a few months after these firearms were purchased from JJ's Pawn and Off-Duty Armory, under the ATF's Phoenix-model in which the firearms were allowed to walk into Mexico, the firearms had reached their destination—the hands of dangerous cartel members in Mexico.

36.     In February 2011, Victor Avila was working in the ICE office in Mexico City. He had been there with his family for a couple of months by this time. Jaime Zapata had just arrived in the Mexico City office of ICE on a temporary duty assignment.

37.     On February 14, 2011, Defendants Alvarez, Miles, Salisbury, Gelista, and Aguilar (hereinafter "Mexico Supervisors") instructed Avila and Zapata to travel down Mexico Highway

57 towards San Luis Potosí to pick up some equipment.  Prior to this, Avila and Zapata were not acquainted, and the equipment was for a case in which neither of these agents was involved.

38.     Less than a month before these orders were given to Zapata and Avila, a security notice had been sent to all embassy employees stating that travel, whether personal or work-related, was restricted on certain highways, including this stretch of Highway 57.  Indeed, the notice indicated that travel in these areas was a direct violation of certain policy.

39.     In addition, an email on February 11, 2011, the same date that Zapata and Avila were ordered to travel on this road, notified Department of Homeland Security that there had recently been a number of skirmishes between cartels and federal forces on this stretch of highway.  The email further indicated that a diplomatic pouch could be used to transport the equipment, rather than having ICE agents travel on this highway to pick it up.

40.     Despite knowing that travel on this highway was restricted, the Mexico Supervisors did not even follow the normal established safety policies and procedures for travel on highways in Mexico.  The established travel policy required preparation of a travel plan many days in advance and notification to Mexican officials so that such officials could arrange an escort for the travel.  The established policy also provided that ICE agents would not travel alone, in one vehicle, but there would be at least two vehicles traveling together and the Mexican government would be present.  None of these policies were followed. Instead, Zapata and Avila were hastily sent out in a single vehicle without any preparation or plan for an escort, and based on information and belief, the Mexican authorities were not notified of the travel plans.

41.     In light of the security notice, the dangers involved, the lack of planning, and the failure to arrange for an escort, Avila had numerous concerns about this trip.  Avila raised these concerns to his supervisors.  Despite Avila's objections, the Mexico Supervisors directed Avila

and Zapata to travel on the dangerous highway unescorted to pick up equipment for a case in which neither agent was involved.

42.     The trip was actually even more dangerous than Avila or Zapata realized because they were sent out in an up-armored Chevrolet Suburban that was insufficient to protect them. The GPS and PA system were inoperable, and the vehicle was improperly maintained.  Further, when the vehicle was placed in park, the vehicle doors automatically unlocked and the weight of the doors allowed them to open.  BAE Sustainability Systems, which was later acquired by Defendant O'Gara, rebuilt, outfitted, and installed armoring on the vehicle but failed to disable the automatic unlock feature.

43.     On February 15, 2011, Zapata and Avila were driving back from picking up the equipment on Highway 57 near Santa Maria Del Rio in the northern state of San Luis Potosi, when Mexican drug cartel members intercepted them.  Zapata, who was driving the vehicle, placed the vehicle in park, which caused the doors to unlock and swing open due to the weight of the armor in the doors.  This provided an opportunity for the cartel members to breach the armored capabilities of the vehicle and open fire on the two agents trapped inside, killing Zapata and severely wounding Avila.

44.     At least three of the firearms used in the attack were recovered and given to the U.S. government.  These firearms originated in the United States. Indeed, the guns were purchased by known straw purchasers as part of cases parallel to the Phoenix model of the Fast and Furious program, in which the ATF knowingly allowed guns to walk into Mexico. Specifically, one of these firearms was the AK-47 variant WASR-10 rifle bearing serial no. 1981MF8477 and purchased by Defendant Riendfliesh as described above.  Another firearm

used in this attack on Zapata and Avila was the AK-47 variant Draco handgun bearing serial no. DC-2777-10 purchased by Otilio Osorio as described above.

> **D.      Since this Attack, the United States has Intentionally Covered Up Facts, Withheld Information from, and Deceived Avila and Zapata's Family**

45.      The ATF acted immediately following this shooting to try to cover up the fact that it allowed these firearms that were used in the attack to walk into Mexico and into the cartel's hands.  William D. Newell reviewed the files in the cases involved shortly after the attack.

46.      A new ATF case was opened in November 2010. The only report of investigation in this case file described a "controlled delivery" of certain firearms; however, this document was not generated until February 25, 2011, *after* the attack on Zapata and Avila.  There is no explanation provided for the report not being created until over three months after the purported controlled delivery in November.   The case file also contains information on Otilio Osorio, Ranferi Osorio, Talamentes, and Morrison, but similarly, this information was not uploaded to the file until *after* the attack on Zapata and Avila.  The only explanation for these after-the-fact additions to the case is that the ATF was trying to cover up the fact that it knew these guns were walking and ending up in Mexico and it did nothing to stop it.  The post-attack activity can only be characterized as an effort by the United States to deceive anyone looking into this incident, including Plaintiffs, into believing that the ATF either did not know about the trafficking or was taking appropriate efforts to stop it—rather than knowingly allowing it to continue, or worse, facilitating the trafficking.

47.      This deceptive motive was confirmed in a March 1, 2011 FBI press release containing numerous misrepresentations.  The press release indicated that the United States was not aware of the Osorio brothers or Morrison prior to October 10, 2010—the date one of the firearms used in the attack was purchased and before the ATF case was opened in November

2010, which has formed the "shell case" to cover the United States' tracks.  In reality, the ATF was aware of Morrison's and Ranferi Osorio's identity and connection with illegal firearm activity well before the purchase of the firearm used to kill Zapata and injure Avila.  Indeed, according to an ATF Management log, an investigation on Morrison and at least one Osorio brother was opened in July 28, 2010.  Shortly thereafter, one of the Osorio brothers and Morrison were arrested on August 7, 2010 for possessing 23 AK-47, or AK-47-variant firearms with the serial number obliterated.  The FBI press release on March 1, 2011 also indicated that a *recent* investigation revealed that Morrison had purchased some guns on July 30, 2010. However, the United States learned this information via an ATF firearms trace dated September 17, 2010— prior to the purchase of the firearm used in the attack.  Notably, the ATF made a decision to allow Morrison and the Osorio brothers to continue their illegal gun trafficking activity, with knowledge that these firearms were being trafficked to Mexico. When at least one of the firearms that the United States allowed to walk into Mexico was used in the attack on Zapata and Avila, the United States intentionally misrepresented its prior knowledge of the trafficking activity and misrepresented its role in allowing (or possibly facilitating) this trafficking.

48.    The United States deliberately misrepresented to the Plaintiffs that it did not know of the Osorio brothers' and Morrison's firearm-related criminal activity before they purchased one of the firearms ultimately used in the attack, when in fact the United States had such knowledge.  The United States made calculated decisions to cover up their knowledge of and complicity in the Osorio brothers' and Morrison's illegal firearm activity, not just to Avila and Zapata's family, but the public.

49.    Moreover, the United States has denied that any of the firearms used in the attack of Avila and Zapata were connected to Operation Fast & Furious.  However, the ATF

Management Log evidences that just after the attack there was a case review done by William Newell, who was ATF Special Agent in Charge in Phoenix where he was intimately involved with Operation Fast & Furious. The only logical explanation for this is that at least one of the firearms used in the attack was a Fast & Furious weapon. On information and belief, the United States has intentionally misrepresented to Plaintiffs (and the public) that none of these weapons had any connection to Operation Fast & Furious and/or parallel cases.

50. On or about July 26, 2011, Congress issued a Joint Staff Report regarding DOJ's Operation Fast and Furious. Congress addressed ATF's and DOJ's failure to share crucial details of Operation Fast and Furious with either their own employees stationed in Mexico or representatives of the Mexican government. The high-risk tactics of cessation of surveillance, gunwalking, and non-interdiction of weapons that ATF used in Operation Fast and Furious went against the core of ATF's mission, as well as the training and field experience of its agents. These inherent flaws of Fast and Furious made its tragic consequences inevitable.

51. It is unknown how many deaths and injuries have resulted from firearms purchased under Fast and Furious and similar cases in other field offices, and the ATF and federal government have actively worked to prevent as few connections being made as possible. However, despite the ATF and federal government's efforts to hide the source of the weapons used to attack Zapata and Avila, Plaintiffs can show that the firearms used in this attack were purchased under ATF cases similar to Fast and Furious.

52. Agent Avila and Zapata's family sought answers from the United States following the attack and were met with misrepresentations and deception about the United States' knowledge that the firearms used in the attack were being purchased by criminals and traveling to Mexico to end up in the hands of cartel members. This resulted in a quantifiable level of

distress over and above the expected level of distress that Zapata's family would have experienced over their son's death and that Avila would have experienced after living through the attack. The United States, through its deception and misrepresentations needlessly and recklessly intensified the Zapata's' and Avila's emotional distress following the attack.

53.     The United States has also retaliated against Avila as an ICE agent because of his questions about events surrounding the attack.

## IV.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM AGAINST DEFENDANT UNITED STATES[3]

54.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all purposes as if set forth fully herein.

55.     The United States, including the ATF and its agents, through Fast and Furious and parallel cases, orchestrated the transfer of firearms from FFLs, to straw purchasers, and into the channels to be smuggled into Mexico, yet deliberately failed to maintain surveillance on these firearms, make any efforts to prevent the firearms from entering Mexico, or interdict the firearms before they reached the cartels. The United States' conduct created, contributed to, and/or increased the risk of harm to anyone in Mexico, specifically agents operating in Mexico such as Zapata and Avila. The conduct was extreme and outrageous, going beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. On information and belief, at least one of the three firearms used in the attack originated from Operation Fast and Furious and/or parallel cases. Yet the United States has denied this fact to

---

[3] Based on the Court's previous Orders dismissing all other claims against Defendant United States, the only remaining cause of action against this Defendant is intentional infliction of emotional distress.

Plaintiffs, despite evidence to the contrary—evidence that the United States has made considerable effort to cover up.

56.     Moreover, the United States has conducted an ongoing cover up to deprive Avila and the Zapata family of the answers they rightfully deserve, in relation to this attack.  The United States has engaged in a deliberate cover up concerning how the weapons involved in the attack came into the hands of these cartel members.  As discussed above, the United States has not only worked to deceive the Zapatas and Avila about the extent of its knowledge of the firearm-related crimes of the purchasers of at least one of the firearms used in the attack, but has misrepresented facts about its knowledge (and potential complicity in) the purchase and trafficking of the firearm(s) to the general public.  The misrepresentations made to the Zapata and Avila following the attack about the United States' involvement in allowing firearm(s) to reach the hands of the cartel to be used in the attack resulted in a quantifiable level of distress over and above the expected level of distress Plaintiffs would have suffered because of the attack itself.

57.     The United States refuses to answer any questions about the reasons behind Zapata and Avila being sent on this highway, unescorted, in an unsafe vehicle.  On information and belief, the United States has deliberately denied information to or presented inaccurate information to Plaintiffs concerning the events leading up to and surrounding the attack.

58.     In addition, the United States, specifically ICE and certain ICE agents, have retaliated against Avila when he began asking "too many" questions about the circumstances of the attack and the weapons used.  This retaliation resulted in, among other things, stripping him of his weapon, computer access, and vehicle, and forcing him to relocate, resign, or retire from his position in Spain without cause.  The acts of retaliation against Avila have continued to date.

59.     The United States has and continues to cause damages with its blatant refusal to answer Avila's and the Zapata family's concerns and questions regarding the attack, the firearms allowed to enter into Mexico, and the United States' involvement.

60.     The last act of this strain of outrageous and tortious conduct – the cover up and misrepresentations set forth in more detail in the above factual allegation section – continues to cause damages to Avila and the Zapata family.

61.     This cover up and the concomitant deception has been committed intentionally and knowingly (or at least recklessly).  The cover up, deception, and retaliation in response to the Avila and the Zapata family asking basic questions about the circumstances surrounding the attack constitute extreme and outrageous conduct.

62.     Defendant's conduct continues to proximately cause severe emotional distress to Avila and the Zapata family.  Plaintiffs are and will continue to suffer severe emotional distress, mental anguish, loss of society, and strain directly relating to their inability to understand the circumstances surrounding the death of Jaime Zapata and the injuries to Victor Avila.  Extreme emotional distress has also resulted from the United States' intentional refusal to answer questions and retaliation against Avila for asking them.

## V.     CLAIMS AGAINST DEFENDANT FFLs

63.      Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all purposes as if fully set forth herein.

64.    Plaintiffs bring the following claims against Defendants JJ's Pawn, Off-Duty Armory, and an Unknown FFL Dealer[4] (hereinafter "Defendant FFLs") each of which are Federal Firearm Licensed Dealers and sellers of firearms:

### A.    *Negligence/Negligent Entrustment/Gross Negligence*

65.    Defendant FFLs owed a duty not to sell any firearm for use by another person when the seller knows or reasonably should know that hat the person to whom the firearm is sold is likely to, and does, use the firearm in a manner involving a reasonable risk of physical injury to others. *See* 15 U.S.C. § 7903(5)(A)(ii).

66.    Moreover, Defendant FFLs owed common law duties to the public, including Plaintiffs, to refrain from creating a dangerous situation where it reasonably appears or should appear to it that others in the exercise of their lawful rights may be injured thereby.

67.    Defendant FFLs likewise had a duty to 1) properly inventory and implement tracking programs; 2) train employees on avoiding unlawful sales and identifying straw purchasers; 3) flag repeat and large quantity sales; and 4) take further preventative measures in conjunction with law enforcement officials to ensure that the these firearms were not being used for unlawful purposes, such as being smuggled to Mexico and to cartels.

68.    On information and belief, Defendant JJ's Pawn knew or reasonably should have known Riendfliesh and Shaffer were likely to use the firearms in a manner that involved an unreasonable risk of physical injury to others.  JJ's Pawn knew or reasonably should have known that the large quantities of AK-47 variant firearms purchased by Riendfliesh and Shaffer were not for recreational use but instead were purchased to illegally traffic same.  As applies to the present case, JJ's Pawn sold a WASR-10, serial no. 1981MF8477, to Riendfliesh.

---

[4] The identity of the FFL who sold the third weapon involved in the murder of Zapata and injury to Avila is being withheld by the United States. Once this information is revealed, Plaintiffs will seek leave to amend to join this third FFL dealer.

69.     On information and belief, Riendfliesh made this purchase as a straw purchaser, immediately transferring the firearm to others who smuggled the firearm into Mexico and into the hands of cartel members.    This firearm, sold by JJ's Pawn, was one of three weapons that breached the vehicle and was used to shoot Avila and Zapata, resulting in the damages set forth below.

70.     On information and belief, Defendant Off-Duty Armory knew or should have known that the AK-47 variant firearms sold to Osorio were straw purchases.    It knew or reasonably should have known that Defendant Osorio would likely use the firearms in a manner that involved an unreasonable risk of physical injury to others.    Nevertheless, Off-Duty Armory sold a Draco bearing serial no. DC-2777-10 to Defendant Osorio.

71.     On information and belief, Riendfliesh made this purchase as a straw purchaser, immediately transferring the firearm to others who smuggled the firearm into Mexico and into the hands of cartel members.    This firearm, sold by Off-Duty Armory, was one of three weapons that breached the vehicle and was used to shoot Avila and Zapata, resulting in the damages set forth below.

72.     On information and belief, Defendant FFLs failed to 1) properly inventory and implement tracking programs; 2) train employees on avoiding unlawful sales and identifying straw purchasers; 3) red flag repeat and large quantity sales; and 4) take further preventative measures in conjunction with law enforcement officials to ensure that the these firearms were not being used for unlawful purposes, such as being smuggled to Mexico and to cartels. Such failures also contributed to the unlawful sales of the firearms that were used in the attack on Zapata and Avila.

73. Defendant FFLs' breach of these duties constitutes negligence and negligent entrustment, which proximately caused injury to Plaintiffs and resulted in the damages described below.

74. Plaintiffs' injuries resulted from Defendant FFLs' gross negligence, which entitles Plaintiffs to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a).

### B.   *Negligence Per Se*

75. Defendant FFLs' unexcused violations of both Federal and State firearms statutes and regulations, including but not limited to provisions of the Gun Control Act, 18 U.S.C. § 922 *et seq.*, constitute negligence per se for which Plaintiffs are entitled to recover.

76. Among the statutes that Defendant FFLs violated are provisions of 18 U.S.C. § 922. For example, under 18 U.S.C. § 922(b), it is illegal for a dealer to sell any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in the State in which the licensee's place of business is located. Similarly, under 18 U.S.C. § 922(d), an FFL may not sell a firearm if it knows or has reasonable cause to believe that such person is under indictment for or has been convicted of a felony, unlawfully uses controlled substances, who is an illegal alien, or otherwise cannot legally purchase a firearm under the statute. Selling to a straw purchaser—i.e., a person who may legally be able to purchase a firearm but is purchasing for someone who could not do so—is likewise illegal.

77. Defendant FFLs each sold firearm(s) to persons who either could not legally purchase firearms under the Gun Control Act and/or to straw purchasers and the persons for whom the firearms were purchased fall into one of the categories of prohibited purchasers under Section 922. For the reasons set forth above, and those that Plaintiffs believe will become

apparent in discovery, the FFLs knew or had reasonable cause to believe that the purchasers either could not legally purchase the firearms and/or were straw purchasers.

78.     These provisions, and analogous provisions under state and federal law were designed to protect the public, including Plaintiffs.

79.     Defendant FFLs' violation of these statutes therefore constitutes negligence per se.  Such negligence proximately caused Plaintiffs' injuries and damages for which they seek recovery.

80.     Alternatively, the Defendant FFLs knowingly violated such state and federal statutes in the sales of these firearms that were used in the attack on Zapata and Avila, thereby making them liable for damages under Section 7905(5)(A)(iii).

## VI.     CLAIMS AGAINST STRAW PURCHASERS

81.      Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all purposes as if fully set forth herein.

82.     Plaintiffs bring the following claims against Defendants Manuel Barba, Otilio Osorio, Ranferi Osorio, Blandon Derrick Shaffer, Kelvin Morrison, Robert Riendfliesh, and John or Jane Doe(s) straw purchaser(s)[5] (hereinafter "Straw Purchasers"):

### A.     *Negligence/Gross Negligence*

83.     Defendant Straw Purchasers owed a duty to not act negligently to create a dangerous situation where it reasonably appears or should appear to him that others in the exercise of their lawful rights may be injured thereby.

---

[5] Because the United States will not reveal trace information concerning the third firearm involved in the shooting, Plaintiffs do not yet know the identity of other potential straw purchasers.

84.     Defendant Straw Purchasers violated this duty by purchasing firearms to transfer said firearms to criminals who would then smuggle the firearms to Mexico and into the hands of cartel members.  The Straw Purchasers knew that these firearms were being acquired for violent, criminal activity. The Straw Purchasers created a dangerous situation through their involvement in acquiring and trafficking these firearms.  It should have been apparent to these Straw Purchasers that by supplying firearms to criminals and violent cartels, there was a high risk that those exercising their lawful rights might be injured.  Indeed, Zapata and Avila, in the course of lawful conduct, were attacked using these firearms that these straw purchasers trafficked to the cartels in Mexico.

85.     Defendant Straw Purchasers' breach of this duty proximately caused damages to Plaintiffs.

86.     Plaintiffs' injuries resulted from Defendant Straw Purchasers' gross negligence, which entitles Plaintiffs to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a).

**B.     *Negligence Per Se***

87.     Defendant FFLs' unexcused violations of both Federal and State firearms statutes and regulations, including but not limited to provisions of the Gun Control Act, 18 U.S.C. § 922 *et seq.*, constitute negligence per se for which Plaintiffs are entitled to recover.

88.     Among the statutes that Defendant FFLs violated are provisions of 18 U.S.C. § 922 which make it illegal to purchase firearms for a person who cannot legally purchase them and also makes it illegal to be involved in the trafficking of firearms.

89.     These statutes were designed to protect the general public, including Plaintiffs. .
Thus, Straw Purchasers' violation of these statutes constitutes negligence per se. Such
negligence proximately caused Plaintiffs' injuries and damages for which they seek recovery.

## VII.    CLAIMS AGAINST BAE SYSTEMS, INC. AND O'GARA

90.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all
purposes as if fully set forth herein.

91.     On the day that they were attacked, Avila and Zapata were in an up-armored
Chevrolet Suburban that was outfitted, armored, and modified by BAE Systems Survivability.[6]
When the cartel members forced Zapata and Avila to stop the vehicle, Zapata put the vehicle in
park, causing the doors to unlock and the heavy armored doors to swing open. The unexpected
opening of the doors and Zapata and Avila's efforts to re-secure themselves in the vehicle gave
their attackers the opportunity to fire numerous rounds inside the vehicle. The attack resulted in
the death of Zapata and severe injury to Avila. Accordingly, Plaintiffs assert the following claims
against BAE Systems, Inc. and O'Gara:

### A.     *Negligence – Marketing Defect*

92.     Defendants knew or should have known of the potential risk of harm presented by
the automatic unlocking feature on up-armored vehicles. Defendants knew or should have
known that the weight of these up-armored doors could cause the doors of the vehicle to open
when the doors were unlocked. Moreover, Defendants knew or should have known that these
vehicles were designed to be used in dangerous situations in which government agents needed
the utmost protection. The risks involved in leaving the auto-unlock feature engaged, which

---

[6] Plaintiffs understand BAE Systems Survivability to be a former division of BAE Systems, Inc., and BAE Systems Survivability transferred its assets and liabilities for the claims set forth herein to O'Gara.

could allow the doors of the vehicle to swing open exposing the agents therein, were reasonably foreseeable to Defendants.

93.     Nevertheless, Defendants failed to provide any warnings about this danger or provide any instructions on how to disable the auto-unlock feature or otherwise ensure that the doors would not open when the car was parked in a compromising situation.

94.     The lack of any warnings or instructions concerning the propensity of these heavy doors to automatically unlock and perhaps open when the vehicle was in park created an unreasonable danger.  Alternatively, if any such warnings or instructions were given, they were inadequate.

95.     In addition, based on information and belief, Defendants failed to warn the United States, its customer, about the dangers in the use of the vehicle and this auto-unlock feature, though Defendants knew of the problem and the United States did not when it accepted delivery of the modified vehicles.

96.     The auto-unlock feature and the propensity for the heavy doors to swing open when unlocked allowed the cartel members to breach the vehicle and it was a contributing cause of the injuries suffered by Plaintiffs.

### B.     Design Defect

97.     At the time that Defendants armored and otherwise modified the vehicle in which Zapata and Avila were attacked, there was a safer alternative design that would have prevented the doors from unlocking and opening.  Specifically, Defendants could have simply permanently disengaged the auto-unlock feature, preventing the vehicle from unlocking automatically when put in park.  This would have prevented or significantly reduced the risk of Zapata's death and

Avila's injuries. Moreover, disengaging this feature was economically and technologically feasible.

98.    Defendants' failure to disengage the auto-unlock feature was a producing cause of Plaintiffs' injuries and the damages for which they seek recovery.

### C.    *Negligent Undertaking*

99.    Defendants undertook the project of up-armoring and otherwise modifying government vehicles for use by federal agents in dangerous or potentially dangerous circumstances.

100.    In doing so, Defendants recognized or should have recognized the undertaking as necessary for the protection of the other's person or things. Indeed, Defendants knew that the purpose of the modifications was to provide ultimate protection to federal agents and officials who were in compromising situations.

101.    Defendants failed to exercise reasonable care to perform this undertaking. Specifically, Defendants failed to ensure that the weight added by the armor did not cause the vehicle to be unreasonably dangers in other aspects. This would include ensuring that the doors do not automatically open if the car is in park, thus negating all benefits of the armor put in the doors. By failing to disengage the auto-unlock feature, Defendants did not exercise reasonable care in performing its undertaking to make a safer vehicle for federal agents.

102.    Defendants' failure proximately caused Zapata's death and Avila's injuries as well as the damages for which Plaintiffs seek recovery.

## VIII.    FOIA CLAIMS AGAINST DOJ AND DHS

103.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all purposes as if fully set forth herein.

104.    Plaintiffs bring this action under the Freedom of Information Act, 5 U.S.C. § 552, for injunctive and other appropriate relief and seeking the disclosure and release of agency records improperly withheld from Plaintiffs by Defendants DOJ and DHS.

105.    Defendant DOJ is a Department of the Executive Branch of the United States Government and includes component entities FBI, DEA, ATF, and the Office of Information Policy (OIP). DOJ is an agency within the meaning of 5 U.S.C. § 552(f).

106.    Defendant DHS is a Department of the Executive Branch of the United States Government and includes ICE.  DHS is an agency within the meaning of 5 U.S.C. § 552(f).

107.    By a letter directed to the U.S. Attorney's Office for the Southern District of Texas, FBI San Antonio Division, U.S. Immigration and Customs Enforcement in Harlingen, Brownsville, and San Antonio dated June 14, 2011, Plaintiffs submitted Freedom of Information Act (FOIA) requests for documentation related to the Zapata and Avila incident, which included specific requests for FBI 302s, DEA 6s, ICE ROIs, ATF documentation, and any investigative reports linked to the incident.

108.    By a separate letter, each agency denied the requests.  DOJ, through the OIP in a letter dated January 20, 2012, denied the appeal for the FBI requested documents.  The OIP denied other requests in a letter dated June 6, 2012.  The Department of Homeland Security, through ICE, denied the requested documents in a letter dated October 20, 2011.

109.    Plaintiffs have exhausted the applicable administrative remedies with respect to their FOIA requests to Defendants DOJ and DHS.

110.    DOJ and DHS have wrongfully withheld the requested records from Plaintiffs.

111.    Plaintiffs request that this Court order DOJ and DHS to 1) disclose the requested records in their entireties and make copies available to Plaintiffs; 2) provide for expeditious proceedings in this action; 3) award Plaintiffs their costs and reasonable attorneys' fees incurred in this action; and 4) grant such other relief as the Court may deem just and proper.

## XI.    WRONGFUL DEATH CAUSE OF ACTION

112.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all purposes the same as if fully set forth herein.

113.    In conjunction with those claims already pleaded, Jaime J. Zapata suffered fatal injuries because of multiple 7.62 mm gunshot wounds to his body fired from multiple AK-47 variant firearms.  Agent Zapata's parents, Plaintiffs Mary and Amador Zapata, are entitled to recover damages from Defendants for the loss of companionship, mental anguish, funeral, and burial expenses they incurred, loss of support, loss of care and affection, and exemplary damages.  All of the injuries and damages, as herein alleged are in an amount in excess of the Court's minimum jurisdictional limits for which Plaintiffs sue.  Plaintiffs incorporate each allegation as set forth herein above, repeat, and re-allege such allegations hereinafter with the same force and effect.

## XII.    TEXAS SURVIVAL STATUTE

114.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all purposes as if set forth herein verbatim.

115.    In conjunction with those claims already pleaded, Plaintiff Mary M. Zapata, in her capacity as Administrator of the Estate of Jaime J. Zapata, is entitled to recover damages on behalf of the Estate for the physical pain and mental anguish suffered by Jaime J. Zapata prior to his death; for the reasonable costs of funeral, burial, and related expenses for the decedent; and for all damages to which the Estate is entitled under the Texas Survival Statute.

## XIII.    DAMAGES

116.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all purposes as if fully set forth herein.

117.    Because of Defendants' acts and omissions as set forth above, Jaime Zapata was killed.  Plaintiffs Amador and Mary Zapata sustained substantial and permanent injuries as a direct and proximate result of the wrongful death of their son, Jaime Zapata.  Plaintiffs Amador and Mary Zapata's injuries include, *inter alia*, past and future loss of love, income, affection, companionship, care, protection, and guidance.  They are experiencing disability, pain, anguish, sorrow, mental suffering, extreme stress, shock, and physical illness.

118.    Moreover, because of Defendants' acts and omissions as set forth above, Plaintiff Victor Avila, Jr. sustained multiple gunshot wounds causing past and future pain and extreme physical and mental anguish, permanent impairment, and disfigurement.

119.    In addition, Defendants' acts and omissions following the attack, including the deliberate cover up, misrepresentations, deception, and retaliation, caused and continue to cause injury to Plaintiffs.

120.    All of the Plaintiffs will suffer for the foreseeable future, if not for the balance of their natural lives.

121. Plaintiffs have suffered losses and damages in a sum that exceeds the minimum jurisdictional limits of the Court. They request any and all actual, pecuniary, consequential, and special damages both past and future, to which they are entitled.

122. The conduct described in the preceding paragraphs was committed in a manner such that Plaintiffs seek exemplary damages in such amount that may be awarded in the discretion of the jury.

## XIV.   JURY DEMAND

123. Demand has already been made for a jury, and Plaintiffs tendered the jury fee.

## XV.   CAPACITIES/CONDITIONS PRECEDENT

124. Plaintiffs bring claims against Defendants in all capacities in which they are liable.   All conditions precedent necessary to bring this suit have occurred or have been performed.

## XVI.   PRAYER

WHEREFORE, Plaintiffs pray that Plaintiffs have and recover from Defendants the following:

    A.    Economic and noneconomic damages or actual damages and exemplary damages;

    B.    Prejudgment interest at the highest legal rate allowed by law;

    C.    Post-judgment interest on said judgment until paid in full;

    D.    Court costs;

    E.    General relief;

    F.    Any and all other relief entitled to by the Plaintiffs.

Respectfully submitted,

By: */s/ Erin A. Hudson*
State Bar No. 24059978
Federal ID 1101277
E. Michael Rodriguez
Federal ID 18759
**ATLAS, HALL & RODRIGUEZ, LLP**
50 Morrison Rd., Suite A
Brownsville, Texas 78520
Telephone: (956) 574-9333
Facsimile: (956) 574-9337

Benigno (Trey) Martinez
Tomas F. Tijerina
**LAW OFFICE OF BENIGNO (TREY)
MARTINEZ, PLLC
LAW OFFICE OF
TONY MARTINEZ, PC**
1201 E. Van Buren
Brownsville, Texas 78520
Telephone: (956) 546-7159
Facsimile: (956) 544-0602

Raymond L. Thomas
Ricardo Pumarejo
**KITTLEMAN, THOMAS &
GONZALES, PLLC**
4900-B North 10th Street
McAllen, Texas 78504
Telephone: (956) 686-8797
Facsimile: (956) 630-5199

Magdalena Villalobos
**RAD LAW FIRM**
2001 Beach Street, Suite 600
Fort Worth, Texas 76103
Telephone: (817) 543-1990
Facsimile: (817) 543-1319

**COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

On September 12, 2014, the undersigned counsel certifies that all counsel of record have been served a copy of the foregoing document in compliance with the Federal Rules of Civil Procedure via the court's electronic filing system, certified mail, and/or facsimile.


/s/ Erin A. Hudson