IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
ENTERED

JUL 1 5 2015

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| MARY M. ZAPATA, Individually and as | § | |
| Administrator of the Estate of Jaime J. Zapata, | § | |
| et al., | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-13-022 |
| | § | |
| UNITED STATES OF AMERICA, et al., | § | |
| Defendants. | § | |

**AMENDED MEMORANDUM OPINION AND ORDER**

This case concerns the tragic circumstances surrounding the death of Jamie J. Zapata and the serious injuries suffered by Victor Avila, Jr., who were attacked by members of a notorious drug cartel while they were performing their duties as agents for the Mexico City Office of Immigration and Customs Enforcement (hereinafter, "ICE"). The gunmen were allegedly using weapons supplied by gunrunners connected with the Fast and Furious Operation run by the Bureau of Alcohol, Tobacco and Firearms (hereinafter, "ATF"). This Court has addressed virtually all of the damage claims made by Mary M. Zapata, individually and as the Administrator of the Estate of Jaime J. Zapata, Amador Zapata, Jr., and Victor Avila (hereinafter, "Plaintiffs") in a series of orders and opinions. In its last opinion, this Court resolved all but one set of claims against the Government—the lone exception being the claims alleging that the Government intentionally inflicted emotional distress (hereinafter, "IIED") on the Plaintiffs.

Prior to ruling on these claims, the Court allowed the Plaintiffs to replead in order to insure that they had the opportunity to fully set out their allegations. The Plaintiffs filed a Fifth Amended Complaint [Doc. No. 172], and the Government renewed its Motion to Dismiss [Doc.

1

No. 178] setting forth three main contentions. First, the Government complains the claims are barred by the foreign country injury exception, 28 U.S.C. § 2680k. Second, the Government maintains that the Plaintiffs have failed to adequately plead an IIED cause of action. Third, the Government claims that even if this Court finds that the Plaintiffs' allegations are sufficient, the claims are nonetheless barred by 28 U.S.C. § 2680(h).

## I.     Plaintiffs' IIED Claims

The Plaintiffs' Fifth Amended Complaint is thirty pages in length. In many places, the allegations merely reallege many causes of action that this Court has already dismissed.[1] While many paragraphs certainly describe the context of the allegations, the very few paragraphs that deal with Plaintiffs' IIED claims are set out here in full:

54.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs for all purposes as if set forth fully herein.

55.    The United States, including the ATF and its agents, through Fast and Furious and parallel cases, orchestrated the transfer of firearms from FFLs, to straw purchasers, and into the channels to be smuggled into Mexico, yet deliberately failed to maintain surveillance on these firearms, make any efforts to prevent the firearms from entering Mexico, or interdict the firearms before they reached the cartels. The United States' conduct created, contributed to, and/or increased the risk of harm to anyone in Mexico, specifically agents operating in Mexico such as Zapata and Avila. The conduct was extreme and outrageous, going beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. On information and belief, at least one of the three firearms used in the attack originated from Operation Fast and Furious and/or parallel cases. Yet the United States has denied this fact to Plaintiffs, despite evidence to the contrary—evidence that the United States has made considerable effort to cover up.

56.    Moreover, the United States has conducted an ongoing cover up to deprive Avila and the Zapata family of the answers they rightfully deserve, in relation to this attack. The United States has engaged in a deliberate cover up

---

[1]   This Court notes that attorneys often retain allegations that have previously been dismissed in a later complaint because they are worried that the failure to do so will be interpreted on appeal as a waiver of those claims or a tacit admission that the Court's dismissal order was correct.

concerning how the weapons involved in the attack came into the hands of these cartel members. As discussed above, the United States has not only worked to deceive the Zapatas and Avila about the extent of its knowledge of the firearm-related crimes of the purchasers of at least one of the firearms used in the attack, but has misrepresented facts about its knowledge (and potential complicity in) the purchase and trafficking of the firearm(s) to the general public. The misrepresentations made to the Zapata and Avila following the attack about the United States' involvement in allowing firearm(s) to reach the hands of the cartel to be used in the attack resulted in a quantifiable level of distress over and above the expected level of distress Plaintiffs would have suffered because of the attack itself.

57. The United States refuses to answer any questions about the reasons behind Zapata and Avila being sent on this highway, unescorted, in an unsafe vehicle. On information and belief, the United States has deliberately denied information to or presented inaccurate information to Plaintiffs concerning the events leading up to and surrounding the attack.

58. In addition, the United States, specifically ICE and certain ICE agents, have retaliated against Avila when he began asking "too many" questions about the circumstances of the attack and the weapons used. This retaliation resulted in, among other things, stripping him of his weapon, computer access, and vehicle, and forcing him to relocate, resign, or retire from his position in Spain without cause. The acts of retaliation against Avila have continued to date.

59. The United States has and continues to cause damages with its blatant refusal to answer Avila's and the Zapata family's concerns and questions regarding the attack, the firearms allowed to enter into Mexico, and the United States' involvement.

60. The last act of this strain of outrageous and tortious conduct – the cover up and misrepresentations set forth in more detail in the above factual allegation section – continues to cause damages to Avila and the Zapata family.

61. This cover up and the concomitant deception has been committed intentionally and knowingly (or at least recklessly). The cover up, deception, and retaliation in response to the Avila and the Zapata family asking basic questions about the circumstances surrounding the attack constitute extreme and outrageous conduct.

62. Defendant's conduct continues to proximately cause severe emotional distress to Avila and the Zapata family. Plaintiffs are and will continue to suffer severe emotional distress, mental anguish, loss of society, and strain directly relating to their inability to understand the circumstances surrounding the death of Jaime Zapata and the injuries to Victor Avila. Extreme emotional distress has also resulted from the United States' intentional refusal to answer questions and retaliation against Avila for asking them.

3

Plaintiffs' Fifth Amended Complaint [Doc. No. 172, pp. 14–16].

These paragraphs assert two basic allegations:

1.  The Government's Fast and Furious gun running operation was conceived, designed, and run in such an outrageous fashion—"going beyond all possible bounds of decency"—as to be "atrocious, and utterly intolerable in a civilized community."

2.  The Government's subsequent and "ongoing cover-up" deprived and continues to deprive the Zapata family and Agent Avila from finding out the truth about how the cartel members came to have the weapons in question and why Agents Zapata and Avila were dispatched on a dangerous mission without adequate preparation and protection.

## II.    The Mexico Mission Claims

As summarized above, a large portion of Plaintiffs' IIED claims center on the actual mission during which Agents Zapata and Avila were attacked. Hypothetically, this Court might agree that the Plaintiffs' allegations, if true, allege conduct that is both unconscionable and grossly, if not criminally, negligent. If the Government actually schemed to send guns to the Mexican drug cartels without tracing them as part of a sting operation, it was, at best, a foolhardy operation. The Government itself prosecutes individuals on a daily basis for doing just what the Plaintiffs claim that it did here.[2]

While some may consider this conduct sufficient to form the basis of an IIED claim, the Plaintiffs cannot avoid the "foreign country injury exception" discussed by this Court in one of its prior Orders. [Doc. No. 127]. *See also* 28 U.S.C. § 2680k. Succinctly put, the Supreme Court has interpreted this exception as prohibiting any claim based upon an injury suffered in a foreign country. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 (2004). Some of the conduct complained about in connection with the incident in Mexico certainly occurred in the United States, but

_____

[2]  In just this Court alone, the Government prosecuted (and achieved convictions against) dozens of individuals for buying guns for others who would then smuggle or attempt to smuggle the weapons into Mexico.

regardless of how one characterizes the alleged conduct, the attack that killed Agent Zapata and seriously wounded Agent Avila occurred in Mexico. Under the controlling case law, especially that which emanates from the Supreme Court, when the injury occurs in a foreign country, the fact that some related conduct occurred in the United States does not save a cause of action. That being the case, the Court grants the Government's Motion to Dismiss [Doc. No. 178] as to all IIED claims that involve the actual Mexican drug cartel attack.

## III.    The Cover-Up Claims

While the claims arising from the Mexico Mission clearly involve injuries occurring in Mexico, the cover-up claims do not. Rather, the cover-up claims involve conduct here in the United States that allegedly injured the individual Plaintiffs in the United States. Consequently, the foreign country injury exception does not apply.

The Government instead focuses its attack on the allegations themselves. The Government claims that Plaintiffs' allegations do not reach the level of misconduct necessary to satisfy the requisite elements of an IIED claim. Second, the Government claims that the allegations themselves do not satisfy the level of specificity necessary to comply with the federal pleading requirements set out in *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). These cases mandate that a claim have "facial plausibility," and that pleadings allege facts sufficient to allow a court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

As one can see from the portions of Plaintiffs' Complaint quoted above (which is the entirety of Plaintiffs' pleadings that appear under the heading "IV Intentional Infliction of Emotional Distress Claim Against Defendant United States"), the IIED allegations are comprised

of either unsupported conclusions or matters of mere speculation—not facts. The following are

the only "facts" that can be gleaned:

1. Paragraph 56 – "the United States has conducted an ongoing cover up . . . ."

   – "the United States has engaged in a deliberate cover up concerning how the weapons involved in the attack came into the hands of these cartel members."

   – "the United States has not only worked to deceive . . . but has misrepresented facts . . . ."

2. Paragraph 57 – "the United States refuses to answer any questions . . . denied information to or presented inaccurate information to Plaintiffs concerning the events leading up to and surrounding the attack."

3. Paragraph 58 – "the United States . . . retaliated against Avila when he began asking 'too many questions' . . . . ."

4. Paragraph 59 – "The United States has and continues to cause damages with its blatant refusal to answer [questions]."

5. Paragraphs 60–62 – These paragraphs contain only conclusory allegations that the deceptive acts caused the Plaintiffs' harm.

This Court realizes that Plaintiffs' allegations in paragraphs 54–62 are preceded by

thirteen pages containing fifty-three paragraphs of factual allegations which are incorporated by

reference. Nevertheless, the allegations of actual cover-up "facts" are few and far between. The

first forty-four paragraphs deal solely with allegations concerning the Mexican operation and the

actual attack upon Agents Zapata and Avila. The remaining factual paragraphs 45–53 purport to

allege facts concerning the cover-up by the federal government. Yet, when one boils down the

allegations, one is left with the following claims:

1. The ATF opened a case file in November of 2010, but the only investigative report was not generated until February 25, 2011—ten days after the attack on Agents Zapata and Avila. The Plaintiffs conclude that this "belated" report was indicative of a cover-up.

2. For support, Plaintiffs reference an FBI press release which Plaintiffs allege contain two misstatements. However, the actual wording of the press release does not match the Plaintiffs' allegations and it certainly does not rise to the level necessary to support an IIED claim.

3. Plaintiffs claim that the press release (which is attached as Exhibit "A") is just a giant misrepresentation and cover-up concerning the Government's illegal gun activities which lead to the incident in Mexico.

4. Finally, Plaintiffs claim that after the incident a case review was performed by William Newell, the ATF Special Agent-in-Charge of the Phoenix office. This was the office involved with operation "Fast and Furious." The Plaintiffs concluded from this fact that one of the firearms used in the Mexico shooting was a Fast and Furious gun. This conclusion may be a reasonable one, but even if correct, it is not necessarily indicative of a cover-up and again does not equate to outrageous conduct.

This Court is troubled by any Governmental operation that is inadequately planned, poorly implemented, and ineptly concluded. It is also disappointed and greatly concerned when anyone, including the Government, transfers dangerous weapons to the drug cartels that are terrorizing Mexico and the southwest United States. The citizens of this community, indeed the entire country, are justifiably concerned when the Government arms a terrorist group and that action leads to the death of one federal officer and the wounding of another. Sending guns to the cartels endangers innocent people on both sides of the Rio Grande. Finally, the citizens of this country would be justifiably disappointed and saddened with any Governmental agency that launched a misguided venture that resulted in the death of one individual and serious injuries to another, and then lied about the venture—especially to a grief stricken family.[3]

The law, however, does not change merely because of the ineptness, the insensitivity, or even the churlishness of the Government. Mere rudeness does not equate with the intentional infliction of emotional harm. Texas law requires that the Plaintiffs allege (and since the case is

---

[3] This Court is certainly aware that sometimes national security or an ongoing law enforcement operation might necessitate the Government to be less than forthcoming, but certainly no one has shown the existence of that necessity to this Court.

in federal court with facts sufficient to comply with the requirements of *Twombly* and *Iqbal*) facts that show: (1) Defendants acted intentionally or recklessly; (2) Defendants' conduct was outrageous; and (3) that the conduct caused the Plaintiffs severe emotional distress. *Benningfield v. City of Houston*, 157 F.3d 369, 379 (5th Cir. 1998).

These elements do not change merely because the Defendant is a governmental unit. The Plaintiffs have alleged an intentional cover-up. Clearly, if true, that cover-up could easily cause severe emotional damage to parents who have lost a son or to an individual who was severely wounded in the course of serving his country. What the Court is faced with, however, is a situation where the allegations concerning the conduct (and the outrageousness of that conduct) are, at best, speculative and/or conclusory. This Court does not find that the factual allegations meet the requirements of *Twombly* and *Iqbal*. Further, the facts, as alleged, do not rise to the level necessary to form the basis of an IIED claim. To qualify as outrageous and extreme, an act must be more than merely rude or insensitive; instead, the act must reach the level of "atrocious and utterly intolerable in a civilized community." *Hughes Training Inc. v. Cook*, 254 F.3d 588, 594 (5th Cir. 2001). Perhaps the Plaintiffs could be more specific if they had access to the documents which have not yet been produced, but, as of now, these allegations are not factually sufficient.

The Court finds that the Plaintiffs' Fifth Amended Complaint concerning the Governmental cover-up fails on two different grounds: (1) it fails to adequately allege any act that is sufficiently outrageous to support an IIED claim; and (2) its overall allegations fail to reach the level required by the Supreme Court and set out in *Twombly* and *Iqbal*. That being the case, the Court need not reach the issue of whether or not Plaintiffs' claims are barred by 28 U.S.C. § 2680(h). That section excludes from the waiver of sovereign immunity implemented by

the Federal Tort Claims Act "any claim arising out of a libel, slander, misrepresentation, deceit or interference with a contractual right . . . ." There is an ongoing dispute as to whether this prohibition is limited to commercial transactions[4] or whether it applies across the board to every situation involving a misrepresentation or deceitful act.[5] As stated above, this Court need not resolve that issue based upon the current state of the pleadings.

## IV.   <u>Conclusion</u>

This ruling has resolved every outstanding issue involved in this case other than the Freedom of Information claims. Earlier this month, the Court entered a scheduling order to resolve that last remaining portion of the case. The Court herein dismisses the last damage-related claim made against the Government by the Plaintiffs. It finds that Plaintiffs' allegations as detailed in their Fifth Amended Complaint are not sufficient for three reasons. First, they do not allege factual misconduct which, if true, would support a finding that such conduct was extreme and outrageous. Second, this Court finds the most pertinent allegations to be conclusory and not factually sufficient to meet the standards set out by the United States Supreme Court in *Twombly* and *Iqbal*. Finally, to the extent the allegations concern the actual Mexico Mission, the claims are barred by the foreign country injury exception.

This Court does not render this ruling lightly as it knows that the Zapata and Avila families have made many sacrifices in the service of this country. Furthermore, the Zaptatas still do not know the full story regarding how and why their son died, nor does Agent Avila have the full story about what led to his injuries. Indeed, if the allegations are to be believed, he has been told to "back off" because he has been asking too many questions about the Fast and Furious

---

[4]   *See United States v. Neustadt*, 366 U.S. 696 (1961); *Block v. Neal*, 460 U.S. 289, 296 n.26 (1983).
[5]   *See Life Partners Inc. v. United States*, 650 F.3d 1026 (5th Cir. 2011); *Metro. Life Ins. Co. v. Atkins*, 225 F.3d 510, 512 (5th Cir. 2000).

Operation. These families, indeed the American public, are owed the truth about this tragedy and about the circumstances that led to guns going to Mexico—guns that shot two Americans and which may have killed many others. Perhaps the answers they seek will be found in the forthcoming document production pursuant to their Freedom of Information requests. That being said, the Plaintiffs' factual allegations against the Government do not support the causes of action they have pled nor the relief they have sought, and therefore must be dismissed.

Signed this 15th day of July, 2015.

Andrew S. Hanen
United States District Judge

# EXHIBIT A

 

## Dallas Division

### Three Dallas-Area Men Arrested on Federal Firearms Charges Related to Trafficking Firearms to a Mexican Drug Cartel

*Ballistic Tests Trace One of the Firearms Used in
February 2011 Shooting of ICE Agents to One of the
Defendants*

| | |
|---|---|
| U.S. Attorney's Office | Northern District of Texas |
| March 01, 2011 | (214) 659-8600 |

DALLAS—Three individuals have been arrested by agents with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), assisted by other state and local law enforcement, on federal firearms charges outlined in two complaints, announced U.S. Attorney James T. Jacks for the Northern District of Texas and Special Agent in Charge Robert R. Champion of the ATF's Dallas Field Office.

Ranferi Osorio, 27, and his brother, Otilio Osorio, 22, were arrested yesterday at their home on East Colonial Drive in Lancaster, Texas. Each Osorio brother is charged with possessing firearms with an obliterated serial number. Separately, according to information contained in one complaint, Mexican officials recently seized three firearms that were used in the deadly shooting on Feb. 15, 2011, of a U.S. Immigration and Customs Enforcement (ICE) agent. One of the firearms recovered was traced by ATF to Otilio Osorio.

An additional defendant, Kelvin Leon Morrison, 25, who is charged in a separate federal criminal complaint, was arrested at his home next door to the Osorio brothers. Morrison is charged with knowingly making false statements in connection with the acquisition of firearms and dealing in firearms without a license.

A detention hearing for Morrison and Otilio Osorio is scheduled for today at 2:00 p.m. CT before U.S. Magistrate Judge Paul D. Stickney in Dallas. Ranferi Osorio's detention hearing is scheduled for March 4, 2011, at 2:00 p.m. CT before Judge Stickney.

According to court documents filed in both cases, a Dallas ATF confidential informant (CI) arranged a meeting in early November 2010 with individuals who had firearms to be transported from Dallas to Laredo. The meeting was arranged related to an investigation of Los Zetas, a notoriously violent and ruthless drug trafficking organization. The weapons in question were ultimately seized by U.S. law enforcement near Laredo, before crossing the U.S./Mexico border.

According to the court documents, at the meeting, two men unloaded several large bags containing firearms into the CI's vehicle, which was kept under surveillance until a traffic stop in Laredo. According to the court documents, the men's vehicle was later stopped by local police and the men were identified as Ranferi and Otilio Osorio. Morrison was the third passenger in the vehicle. The vehicle stopped in Laredo was searched and 40 firearms, all with obliterated serial numbers, were seized. Trace results indicated that three of these firearms could be specifically traced to Morrison, who bought them from federal firearms licensees (FFL) in the Dallas/Fort Worth area on Nov. 4, 2010. The investigation now has also revealed that on Aug. 7, 2010, a Romarm, model WASR, 7.62 caliber rifle was discovered by law enforcement officers in LaPryor, Texas, near the U.S./Mexico border. Trace results indicated that Morrison purchased this firearm on July 30, 2010, from a FFL. According to the affidavit, between July 10, 2010, and Nov. 4, 2010, Morrison purchased 24 firearms from FFLs.

In addition, according to one affidavit filed in the case, one of the three firearms used in the Feb. 15, 2011, deadly assault of ICE Special Agent Jaime Zapata that was seized by Mexican officials has been traced by ATF to Otilio Osorio. Otilio Osorio allegedly purchased that firearm on Oct. 10, 2010, in the Dallas/Fort Worth metroplex, prior to law enforcement's awareness of the purchase. Ballistic testing conducted by Mexican authorities on this firearm indicated it was one of the three firearms used during the deadly assault on Special Agent Zapata's vehicle.

A federal complaint is a written statement of the essential facts of the offenses charged, and must be made under oath before a magistrate judge. A defendant is entitled to the presumption of innocence until proven guilty. If convicted, the penalty for possessing a firearm with an obliterated serial number is five years in prison and a $250,000 fine, per count. The penalty for knowingly making false statements in connection with the acquisition of firearms is 10 years in prison and a $250,000 fine, per count. The penalty for dealing in firearms without a license is five years in prison and a $250,000 fine, per count.

### Dallas Division Links

Dallas Home

Contact Us
- Overview
- Territory/Jurisdiction

News and Outreach
- Press Room | Stories
- In Your Community

About Us
- Our People & Capabilities
- What We Investigate
- Our Partnerships
- Dallas History

Wanted by the FBI - Dallas

FBI Jobs

The ongoing investigation is being conducted by the ATF, DEA, FBI, U.S. Immigrations and Customs Enforcement - Homeland Security Investigations, and the Lancaster, Texas, Police Department. These cases are being prosecuted by Assistant U.S. Attorney Gary Tromblay for the Northern District of Texas.

This content has been reproduced from its original source.

Close

https://www.fbi.gov/dallas/press-releases/2011/dl030111.htm